[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-10732
_____

D.C. Docket No. 1:10-cv-03066-AT

MARY GOODMAN,
as next friend Bruce Goodman,
MARY GOODMAN,

Plaintiffs - Appellants,

versus

CLAYTON COUNTY SHERIFF KEMUEL KIMBROUGH,
ROBYN BOLAND,
HERBERT FEEMSTER,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(June 21, 2013)

Before WILSON and COX, Circuit Judges, and VOORHEES,[*] District Judge.

WILSON, Circuit Judge:

Bruce Goodman (Goodman), a 67-year-old man suffering from dementia and prone to disorientation and confusion, was severely beaten by his cellmate while detained at the Clayton County Jail (the Jail) in the early morning hours of September 9–10, 2008.  By and through his wife and next friend, Goodman filed suit under 42 U.S.C. § 1983 against the two officers charged with his supervision at the Jail in their individual capacities, and against the Sheriff of Clayton County in his official capacity.  The district court granted the defendants' motion for summary judgment.  This is the appeal.  Although the officers' dereliction of duty on the night in question concerns us, the law compels that we affirm the judgment of the district court.

## I. Background

We relate the facts—as we must at this stage of the litigation—in the light most favorable to Goodman.  *See Goebert v. Lee County*, 510 F.3d 1312, 1316 (11th Cir. 2007).  In January 2008, Bruce Goodman suffered a stroke.  In the months that followed, his cognitive functioning deteriorated rapidly, and by September he presented symptoms of early onset dementia, including occasional confusion, disorientation, and wandering.  Goodman has been married to his wife,

---

\* Honorable Richard L. Voorhees, United States District Judge for the Western District of North Carolina, sitting by designation.

Mary Goodman, for over 30 years. On September 9, Mary Goodman awoke to find that her husband was not in bed and had left the couple's trailer. He had apparently taken a walk, become confused, and attempted to gain entry to another trailer. When the trailer's occupants called the police, Goodman was arrested for loitering and brought to the Jail.

Upon phoning 911 and learning that her husband had been arrested, Mary Goodman went to the Jail. She showed the officer at the second-floor desk her husband's medical records, explained that he was cognitively impaired and showing signs of dementia, and asked the officer to ensure that her husband received his medication and that he be placed either in the infirmary or in isolation so that he would not unintentionally insult another inmate and thereby come in harm's way.

Goodman was assigned to Housing Unit 7, an orientation unit in the Jail. He was specifically placed in Section 6 of Unit 7, the administrative segregation (or "admin") section, where inmates are placed out of concern for their own safety or the safety of others. Though administrators at the Jail generally endeavor to place only one prisoner per cell in the admin section, Goodman was housed with another inmate, Antonio Raspberry.

Officers Robyn Boland and Herbert Feemster were the officers assigned to Unit 7 on the night in question. Boland worked in the control tower and Feemster

3

served as the "runner," orienting new detainees and—or so it was thought—performing "head counts" and "cell checks" of all the inmates in the unit. Clayton County Sheriff's Department (Sheriff's Department) policy required that Officers Boland and Feemster perform a "head count," which involves entering the cells and physically looking at the inmates' faces and arm bands, at 6 p.m. and midnight each night. Policy also required the officers to walk by each cell and look into the window (known as a "cell check") once per hour after midnight. Although Feemster reported having completed the 6 p.m. head count, he only checked the cells in the admin section through the cell window and failed to enter the cells as required. Neither officer conducted the required head count at midnight, nor did they conduct a single cell check on the night Goodman was injured.

The officers claim that the night of September 9 was extraordinarily busy, and that 42 detainees were awaiting orientation when the officers arrived to start their shift. They contend that they asked for additional manpower to assist them in their duties, but a supervisor denied their request. They also claim that during the 6 p.m. head count, an inmate had reported a desire to harm himself, a contingency that required Feemster to escort the troubled inmate to the infirmary and prepare a report about the incident. Despite the officers' protestations that they were too busy to complete the required head counts and cell checks, Officer Boland made a

4

long visit to another section of the Jail and took two lunch breaks rather than the one lunch break to which she was entitled.

At around 5 a.m. the next morning, Officer Feemster entered Goodman and Raspberry's cell to deliver breakfast. Goodman was sitting on his bunk, covered in blood. He had contusions about his face. His eyes were swollen shut. The cell was laden with blood. Feemster called a supervisor, who asked Goodman what had caused his injuries. Goodman, clearly bewildered, lifted up his hands and said, "These two right here." When asked why he had harmed himself, Goodman responded, "They told me to." Despite Goodman's statements, a Sheriff's Department investigative report subsequently found that Raspberry, Goodman's cellmate, had inflicted the beating on Goodman. Goodman's injuries were severe: he was taken to the intensive care unit at the local hospital and held there for seven days, and he spent two to three weeks in the Jail infirmary after being released from the hospital.

The Internal Affairs Division of the Sheriff's Department subsequently conducted an investigation, which revealed that one inmate, El Hadji Toure, had pushed the emergency call button in his cell several times during the night in question. Toure would later tell a Sheriff's Department investigator that he had pushed the button in order to notify officers that he heard a fight going on in Goodman's cell. Boland and Feemster both admitted that—contrary to Sheriff's

Department policy—they had deactivated Toure's call button because they believed he was pushing the button so that he could request free time to use the telephone. Boland further testified that she sent an inmate worker to ask Toure what he wanted, and the inmate worker reported back that Toure wanted to use the telephone.

The Sheriff's Department investigative report also included the statements of two other inmates, Darin Slocum and Calandra Carmichael, who both reported that they heard sounds of a man being beaten coming from Goodman's cell throughout the night. Boland and Feemster both adamantly deny having been aware of any violence or anything out of the ordinary in Goodman's cell on the night of the incident. Both officers testified that they neither saw nor heard anything that would have made them aware of any risk to Goodman that night. Goodman did not depose any of the inmates who heard the melee in Goodman's cell that night, nor did Goodman depose the inmate worker regarding what message he received from Toure or what he in turn relayed to Boland or Feemster.

Based in part on the investigative report, the Sheriff's Department obtained a criminal arrest warrant charging Raspberry with Goodman's beating. Upon the conclusion of the Internal Affairs investigation, the Sheriff's Department recommended that Officers Boland and Feemster be permanently terminated because they had been "neglectful in [their] duties . . ., which allowed Bruce

6

Goodman #3574959 to become injured."  Nonetheless, after further review, the

Sheriff's Department reduced Boland and Feemster's suspensions to 30 days, and

these 30-day suspensions were later shortened to 14 days.

Mary Goodman claims that ever since the violent episode at the Jail, her

husband has been permanently altered and that, due to the advancement of his

dementia, he is now indefinitely confined to a nursing home.

Acting as next friend to her husband, Mary Goodman sued Boland and

Feemster in their individual capacities for violating Goodman's Fourteenth

Amendment rights by demonstrating a deliberate indifference to a substantial risk

that he would be seriously injured at the Jail.  She also sued Sheriff Kimbrough in

his official capacity for her husband's injuries and, lastly, sued on her own behalf

for loss of support and consortium.  The district court granted summary judgment

as to all claims, and Goodman appeals.

## II. Discussion

We review the district court's grant of summary judgment de novo, viewing

the facts and drawing all reasonable inferences in the light most favorable to

Goodman, the nonmoving party.  *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d

334, 341–42 (11th Cir. 2012).  We will affirm the grant of summary judgment if

we conclude that there is no genuine issue of material fact—that is, if no "fair-

7

minded jury could return a verdict for the plaintiff on the evidence presented."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986).

### 1. Individual Capacity Claims Against Boland and Feemster

"A prison official's deliberate indifference to a known, substantial risk of
serious harm to an inmate violates the Fourteenth Amendment." *Cottone v. Jenne*,
326 F.3d 1352, 1358 (11th Cir. 2003) (alteration omitted) (internal quotation marks
omitted).[1]  To survive summary judgment in a case alleging deliberate
indifference, a plaintiff must "produce sufficient evidence of (1) a substantial risk
of serious harm; (2) the defendants' deliberate indifference to that risk; and (3)
causation." *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003) (per
curiam) (internal quotation marks omitted).

The second element—that Boland and Feemster have evidenced a deliberate
indifference to a serious risk that Goodman would be injured—forms the crux of
the matter at hand.  To prove that Boland and Feemster were deliberately
indifferent to the risk that he would be injured, Goodman had to prove:
"(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk;

---

[1] Technically, the deliberate indifference cause of action grew up in Eighth Amendment jurisprudence and applies only to convicted prisoners. *See Purcell ex rel. Estate of Morgan v. Toombs County*, 400 F.3d 1313, 1318 n.13 (11th Cir. 2005).  Where, as here, the plaintiff is a pretrial detainee such as Goodman, the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment's prohibition against cruel and unusual punishment, governs our analysis. *See Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 n.4 (11th Cir. 1995).  Regardless of the particular taxonomy under which we analyze the case, however, the result is the same, because "the standards under the Fourteenth Amendment are identical to those under the Eighth." *Goebert*, 510 F.3d at 1326.

8

(3) by conduct that is more than gross negligence." *Townsend v. Jefferson County*, 601 F.3d 1152, 1158 (11th Cir. 2010) (alteration omitted) (internal quotation marks omitted). Proof of deliberate indifference requires a great deal more than does proof of negligence: "To be deliberately indifferent a prison official must know of and disregard 'an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*.'" *Purcell*, 400 F.3d at 1319–20 (emphasis supplied) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979 (1994)).

In other words, a plaintiff in Goodman's position must show not only that there was a substantial risk of serious harm, but also that Boland and Feemster "subjectively knew of the substantial risk of serious harm and that [they] knowingly or recklessly disregarded that risk." *Hale*, 50 F.3d at 1583 (alteration omitted) (internal quotation marks omitted). Whether prison officials had the requisite awareness of the risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842, 114 S. Ct. at 1981 (citation omitted). At the same time, the deliberate indifference standard—and the subjective awareness required by it—is far more onerous than normal tort-based standards of

9

conduct sounding in negligence: "Merely negligent failure to protect an inmate from attack does not justify liability under [§] 1983." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam).  And needless to say, to defeat a motion for summary judgment, Goodman must adduce specific evidence from which a jury could reasonably find in his favor; "[t]he mere existence of a scintilla of evidence in support of [his] position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512.

We turn then to the facts of this case.  Viewing the facts and taking all reasonable inferences in Goodman's favor, the evidence shows that: (1) Boland and Feemster failed to perform the required cell checks and the midnight head count in Section 6; (2) Feemster reported having completed the 6 p.m. head count even though he did not actually enter the cells in Section 6; (3) Boland and Feemster deactivated emergency call buttons that evening without investigating the reason the buttons had been pressed; (4) Toure told an inmate worker that there was a fight in Goodman's cell; (5) three inmates, including Toure, heard sounds of violence emanating from Goodman's cell; and (6) despite claiming that she was swamped with inmates awaiting orientation, Boland took two lunch breaks and made a long visit to intake on the night Goodman was attacked.

In our view, the problem with this case is that no evidence presented would support a reasonable jury's finding that Boland and Feemster harbored a subjective

awareness that Goodman was in serious danger while in his cell on the night of September 9–10, 2008. The failure to conduct the cell checks and head counts is negligence of the purest form; it is of no value in answering the key question here—namely, whether Boland and Feemster *knew* of a substantial risk of serious harm to Goodman. The deactivation of the emergency call buttons is more egregious, but here too we find evidence of negligence—perhaps gross negligence—but nothing indicating that the officers knew Goodman was in danger and, equipped with that knowledge, deliberately disregarded the risk. To begin, no call button was ever activated in Goodman's cell—instead, the evidence shows that Toure's call button was the one activated and subsequently ignored. The fact that one inmate was pressing his call button does not suggest that Boland and Feemster were subjectively aware of a risk to another inmate entirely, and it is the risk to Goodman that matters here. Further, even accepting Toure's statement that he told an inmate worker about the ruckus ensuing in Goodman's cell, that does nothing to show that Boland or Feemster were ever told of this report or otherwise made subjectively aware of the emergent situation in Goodman's cell.[2] Goodman did

---

[2] To boot, all of this ignores the fact that Toure's statements, included as part of the Sheriff's Department investigative report, are rank hearsay. Even accepting that the conclusions drawn in the report itself are admissible under the public records exception to the hearsay rule, *see* Fed. R. Evid. 803(8), the statements of third-parties within that report are double hearsay not within any exception to the rule. "[P]lacing otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) (internal quotation marks omitted); *see also Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012) (noting that a district

11

not depose the inmate worker or any of the other inmates in Section 6, so there is no evidence indicating that Officer Boland or Feemster walked by Goodman's cell while audible noises of violence could be heard from within.  Indeed, the only evidence of what Officers Boland and Feemster were actually aware of is their own adamant denials of the fact that they ever feared for Goodman's safety in any way.

Make no mistake—we do not quarrel with the proposition that, by failing to diligently carry out their duties at the Jail, Boland and Feemster wronged Goodman.  *See Purcell*, 400 F.3d 1319 ("[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." (alterations in original) (internal quotation marks omitted)).  But we are mindful that, just as not every injury is an injury of constitutional magnitude, not every wrong that would be actionable at state or common law is cognizable as a constitutional tort under § 1983.  Indeed, "[i]t is not . . . every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety."  *Farmer*, 511 U.S. at 834, 114 S. Ct. at 1977.

court can consider hearsay in ruling on a motion for summary judgment only "if the statement could be reduced to admissible evidence at trial or reduced to admissible form" (internal quotation marks omitted)).  Goodman argues that the statements in the investigative report fall under the hearsay exception for statements against interest, but he is wrong.  Putting aside the fact that the declarant must be unavailable for the statement-against-interest exception to apply, *see* Fed. R. Evid. 804(b)(3), the statements at issue must also be against the interest of the *declarant*—here, Toure—in order to fall within the exception's terms.  *See United Techs. Corp.*, 556 F.3d at 1279–80.  Toure's statement that he heard a scuffle in Goodman's cell is not against Toure's interest in any way, and the statement-against-interest exception is therefore inapplicable.  At any rate, it does not matter whether Toure's statements are inadmissible hearsay, because even considering them, they are not probative of the pertinent question at issue here: whether Boland and Feemster were subjectively aware of a risk to Goodman.

That subtle distinction is dispositive of this appeal.  Our cases are clear that to survive summary judgment on a deliberate indifference claim, the plaintiff must present some evidence of prison officials' subjective awareness of a substantial risk of serious harm to the inmate.  *See, e.g.*, *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (explaining that "a finding of deliberate indifference requires a finding of the defendant's subjective awareness of the relevant risk" (internal quotation marks omitted)).  Goodman has adduced no evidence that either Boland or Feemster was subjectively aware of the peril to which Goodman was exposed on the night in question, and that failure is fatal to his claim.  And though Goodman points to the officers' failure to conduct head counts and cell checks and their disengagement of the emergency call buttons in support of his assertions, the fact that the officers deviated from policy or were unreasonable in their actions—even grossly so—does not relieve Goodman of the burden of showing that the officers were subjectively aware of the risk; in other words, he cannot say, "Well, they should have known."  Were we to accept that theory of liability, the deliberate indifference standard would be silently metamorphosed into a font of tort law—a brand of negligence redux—which the Supreme Court has made abundantly clear it is not.  *See Farmer*, 511 U.S. at 838, 114 S. Ct. at 1979 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as [a constitutional

13

violation]."); *see also Paul v. Davis*, 424 U.S. 693, 701, 96 S. Ct. 1155, 1160 (1976) (noting "the constitutional shoals that confront any attempt to derive from congressional civil rights statutes a body of general federal tort law" (internal quotation marks omitted)).  Although we view the evidence and draw all inferences in the light most favorable to Goodman, we cannot reasonably base an inference on mere supposition, and nothing in this record creates a genuine issue of fact as to whether Officers Boland and Feemster were subjectively aware of a substantial risk of serious harm to Goodman.  *See Carter*, 352 F.3d at 1350.  The district court did not err in granting summary judgment in the officers' favor.[3]

Our decision in this case should not be taken to condone Boland and Feemster's actions.  To the contrary, we are disturbed by the dereliction of duty that facilitated the violence visited upon Goodman while he was under the officers' charge.  But we are federal judges, not prison administrators, and the standards for coloring a constitutional claim in this area of the law are exacting for the very purpose of preventing federal judges like us from meddling, even by our best lights, in the administration of our nation's prisons.  *Cf. Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S. Ct. 2392, 2400 (1981) (explaining that many of the administrative considerations attendant to operating a correctional institution "properly are weighed by the legislature and prison administration rather than a

---

[3] Because Goodman's deliberate indifference claim fails, Boland and Feemster have no need of qualified immunity, and we do not address it.  *See Carter*, 352 F.3d at 1350 n.10.

14

court"). Therefore, and although we empathize with Goodman's plight, it is the law—and not our personal sympathies or desires—that must ultimately govern the resolution of this case, and the law requires that we affirm the district court's grant of summary judgment. *See Carter*, 352 F.3d at 1350; *Hale*, 50 F.3d at 1582 (affirming grant of summary judgment where jailer failed to make required rounds every thirty minutes and pretrial detainee was severely beaten).

### 2. *Official Capacity Claims Against Sheriff Kimbrough*

Goodman's claim against Sheriff Kimbrough in his official capacity fares no better. "It is well established in this [c]ircuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Cottone*, 326 F.3d at 1360 (internal quotation marks omitted). Instead, to establish liability against Sheriff Kimbrough in his official capacity, Goodman had to prove that he suffered a constitutional deprivation as the result of: "(1) an action taken or policy made by an official responsible for making final policy in that area of the [Sheriff's Department's] business; or (2) a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." *Hale*, 50 F.3d at 1582 (internal quotation marks omitted).[4] Demonstrating a policy or custom generally

---

[4] Though Sheriff Kimbrough is the named defendant, "a suit against a governmental official in his official capacity is deemed a suit against the entity that he represents." *Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir. 1999) (per curiam).

requires the plaintiff "to show a persistent and wide-spread practice." *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004) (internal quotation marks omitted).

Goodman does not allege that any official Sheriff's Department policy violated his constitutional rights. In fact, he concedes that the Sheriff's Department's written policy required Boland and Feemster to conduct head counts inside every cell at 6 p.m. and midnight, and to conduct visual cell checks once per hour after midnight. He also concedes that Sheriff's Department policy expressly forbade Boland and Feemster from deactivating emergency call buttons in the cells at the Jail. Therefore, Goodman cannot claim that an official action or policy of the Sheriff's Department caused his injury. Nonetheless, Goodman contends on appeal that Boland and Feemster's violation of written Sheriff's Department policies was so widespread that it constituted a custom with the force of law. *See Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) ("A custom is a practice that is so settled and permanent that it takes on the force of law."). We cannot agree.

"Our decisions establish that supervisory liability for deliberate indifference based on the implementation of a facially constitutional policy requires the plaintiff to show that the defendant had actual or constructive notice of a flagrant, persistent pattern of violations." *Goebert*, 510 F.3d at 1332. Boland and Feemster did testify that it was common practice at the Jail to deactivate emergency call buttons and to

16

remain outside the cells in the admin section when doing head counts.  But in determining whether a custom existent at the Jail caused Goodman's injuries for purposes of § 1983, the relevant inquiry is whether the Sheriff's Department "had established customs and policies that resulted in deliberate indifference to constitutional violations."  *Mathews v. Crosby*, 480 F.3d 1265, 1275 (11th Cir. 2007).

As we see it, the fact that jailers in Clayton County did not enter every cell in accordance with policy and commonly deactivated emergency call buttons is simply insufficient to meet the "extremely rigorous standard for supervisory liability" that our cases demand in cases such as these.  *See Goebert*, 510 F.3d at 1332 (internal quotation marks omitted); *West v. Tillman*, 496 F.3d 1321, 1329 (11th Cir. 2007) (per curiam) (affirming district court's grant of summary judgment because "Plaintiffs have failed to meet the 'extremely rigorous' standard for supervisory liability" (quoting *Cottone*, 326 F.3d at 1360)).  We are unable to conclude that these policy violations are sufficient to create a genuine issue of fact as to the existence of a custom, so settled and permanent as to have the force of law, that ultimately resulted in deliberate indifference to a substantial risk of serious harm to Goodman.  *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1116 (11th Cir. 2005) (explaining that sheriff's policies or customs must themselves evidence a deliberate indifference to, and therefore a

17

subjective awareness of, a substantial risk of serious harm).  That is especially so in light of the undisputed evidence that Officers Boland and Feemster were disciplined—and in fact recommended for termination—following their violations of Sheriff's Department policy on the night Goodman was injured.  *See West*, 496 F.3d at 1329–30.  And all of that says nothing about the remarkable fact that Goodman's complaint is bereft of any allegation that Sheriff's Department policy or custom actually caused Goodman's injuries. The district court did not err in granting summary judgment for Sheriff Kimbrough.[5]

### 3. *Mary Goodman's Loss of Consortium Claim*

Having resolved Goodman's constitutional claims, Mary Goodman's state-law loss of consortium claim falls neatly into place.  Under Georgia law, a claim for loss of consortium by one spouse is derivative and dependent upon the existence of some viable claim by the other spouse.  *Henderson v. Hercules, Inc.*, 324 S.E.2d 453, 454 (Ga. 1985); *see Sevcech v. Ingles Mkts., Inc.*, 474 S.E.2d 4, 9 (Ga. Ct. App. 1996) ("Loss of consortium claims are derivative.").  Because Goodman's principal claims fail, it follows that Mary Goodman's derivative loss of consortium claim must fail too.

## III. Conclusion

---

[5] Goodman also brought a claim against Kimbrough for negligent hiring, supervision, and retention.  The district court granted summary judgment as to this claim, and Goodman does not raise it in his briefs.  We deem it abandoned.  *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1335 (11th Cir. 2004).

Although the facts of this case are disturbing, we conclude that the district court did not err in granting the defendants' motion for summary judgment.

**AFFIRMED.**


COX, Circuit Judge, specially concurring:

I do not join Judge Wilson's opinion, but I concur in the result.