[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-13748
Non-Argument Calendar
_____

D.C. Docket No. 6:12-cv-00078-BAE-JEG


JESSE L. LOSEY,

Plaintiff-Appellant,

versus

WARDEN DANNIE THOMPSON, et al.,

Defendants,

TIFFANY NAIL,
Correctional Officer,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(January 2, 2015)

Before TJOFLAT, HULL, and WILSON, Circuit Judges.

PER CURIAM:

In this civil action under 42 U.S.C. § 1983, plaintiff Jesse Losey appeals the grant of summary judgment in favor of defendant Tiffany Nail, a correctional officer at the prison where plaintiff Losey was incarcerated at the time of the events in issue.  Losey's complaint alleged defendant Nail violated his rights under the Eighth Amendment by failing to protect him from violence by another inmate, Reggie Whitehead.  After careful review of the record and the briefs, we affirm the district court's grant of summary judgment in favor of the defendant Officer Nail.

## I.  BACKGROUND

Plaintiff Losey was raped by inmate Whitehead during his incarceration.  He alleges that the rape could have been prevented if defendant Officer Nail had properly performed her duties as a correctional officer.

We relate the factual background—as we must at this stage of the litigation—in the light most favorable to the nonmovant, here plaintiff Losey.  Goodman v. Kimbrough, 718 F.3d 1325, 1329 (11th Cir. 2013).

**A.    The Unit**

On July 8, 2010, Losey was an inmate in the D-1 unit at Smith State Prison ("SSP") in Glennville, Georgia.  The D building at SSP contained D-1 and D-2, two dormitory units separated by a control room.  D-1 had the capacity to hold 101

inmates.  The unit would be staffed with a dorm officer, as would the D-2 unit. The control room was also staffed with a correctional officer.

**B.     Events Prior to the Attack**

At some point between 8:00 p.m. and 9:00 p.m. on July 8, 2010, Losey entered Whitehead's cell in the D-1 unit to use a contraband cell phone.  Because other inmates were also using the contraband phone, Losey had to wait for a period of time before making the first of three short phone calls.  He waited again, in Whitehead's cell, before the second and third calls.  After concluding his phone calls, Losey remained in Whitehead's cell, using Whitehead's desk to write what Losey remembers as his commissary list.

In his deposition, Losey admits that he used Whitehead's contraband phone in this manner for roughly one week, that he was "hang[ing] out in [Whitehead's cell] occasionally," and that Losey was aware of Whitehead's reputed affiliation with and leadership in a prison gang.  Prior to the attack, Whitehead "always seemed nice" to Losey, and Losey "figured if [he] knew someone that was important there, [he] would have an easier time [in SSP]."

Though Losey and Whitehead were lodged in separate cells in the D-1 unit on the night of the July 8 attack, Losey had moved into Whitehead's cell for "about two or three days" earlier in July.  Nothing in the record suggests Losey had any discomfort or fear of being alone with Whitehead prior to the attack.

3

## C.    The Attack on 8 July 2010

While Losey sat writing by the desk, Whitehead rose, walked over to the cell door, closed and locked the door, and turned off the lights inside the cell. Whitehead then walked back over to Losey and put him in a chokehold.  He told Losey to lay flat on his stomach on the lower bunk. (Id. at 43-44) Losey's head was positioned towards the door, with his face in the blanket at the foot of the bed. Whitehead proceeded to rape Losey.   Losey initially pleaded with Whitehead, but "knew that it was pointless . . . to really fight" and did not further resist Whitehead's attack.

In his deposition, Losey states he was unsure exactly how long the rape lasted, but it was at least fifteen or twenty minutes.  In the incident report filed following the attack, Losey stated that he believed the rape occurred at approximately 11:00 p.m.  In his deposition, Losey stated that it was likely 10:00 or 10:30 when he was placed in the chokehold.  Losey acknowledges that he did not know, even at the time of the incident, the precise time the rape occurred.

At some point during the rape, however, Losey recalls another inmate calling "twelve," which was the signal for a correctional officer entering the dorm. Following this signal, and still during the rape, Losey observed the presence of an officer with a flashlight at the window to Whitehead's cell.  The officer shined the flashlight through the window in the door, in a "swaying motion" across the cell.

4

The light from the flashlight did not illuminate the cell, but rather cast a beam within the cell.  The flashlight remained at the window for three to five seconds. From Losey's perspective, the officer was "looking in the room but not looking in the room, to where she was maybe, [ ] looking more [ ] towards the lockers to make it look like she was looking in but not actually looking in."  Losey introduced no testimony that the officer acknowledged the presence of two bodies on the lower bunk of the cell.

Nor did Losey get a clear view of the officer who was standing at the window. Upon initial questioning in his deposition, Losey described the guard as "female" and "probably a little bit heavier set."  When initially asked about the guard's race, Losey said she was white.  Defendant Officer Nail is African-American.  Losey acknowledges that he does not know Officer Nail.

Clarifying his statement in response to further direct questioning, Losey admitted: "I didn't see the person at all, really."  Losey explained that he saw the officer's hair and part of her uniform, and that he again saw the uniform and same color hair as the officer walked along the upper level of the dorm across the hall some minutes later.  And in response to later questioning by his own counsel, Losey explained that he "couldn't see" the officer at the cell door with the flashlight, but that he "saw the one upstairs" and "just assumed" that it was the same officer.

5

**D.    Officer Nail's Actions**

On the night of July 8, 2010, Officer Nail worked the third shift, which runs from 10:00 p.m. until 6:00 a.m. the following morning.  She was assigned to be the dorm officer for the D-1 unit that night.  At 11:30 p.m., Officer Nail, after performing a census check, reported a census count of 100 inmates to the control room officer.  That count is recorded in the control room officer's log.

Though Officer Nail does not specifically remember the census check she performed on the night of July 8, 2010, she testified that it usually took place around 11:25 p.m. on nights when lockdown would not occur until 1:00 a.m.[1]  In her deposition testimony, Officer Nail acknowledged that the purpose of a census check was simply to "count heads," whether the inmates were in the dayroom or in their cells.  Officer Nail also stated that, unlike the more formal census count that occurs at lockdown, the census check is performed by one officer, the officer assigned to that dorm unit.

In her declaration, Officer Nail averred that she "did not see Plaintiff Jesse Losey, or any other inmate, being held down or raped in a cell at Smith State Prison on July 8, 2010 or at any other time."  Officer Nail further averred that had she seen an inmate being held down or raped or even seen two inmates lying on the same bunk, she would have immediately called for assistance to separate the

---

[1]On the night of the attack, the record shows that lockdown did not occur until 1:00 a.m.

6

inmates.  No other evidence in the record indicates that Officer Nail actually witnessed any inmate-on-inmate assault, or the presence of two inmates on a single bunk, on the night of July 8, 2010.  Officer Nail also averred that she had no information or knowledge of inmate Whitehead's history or gang affiliation on July 8, 2010.

### E.    The Complaint and Initial District Court Proceedings

On April 18, 2012, Losey filed a complaint in the Superior Court of Fulton County against the Georgia Department of Corrections (GDOC), the GDOC Commisioner, the Warden of SSP, and various SSP correctional officers.  At the time, Officer Nail's identity was unknown to Losey.  She was designated as "Mary Doe" in the initial complaint.  That complaint included a state law claim against GDOC.

On July 2, 2012, the state court entered a consent order dismissing that state law claim along with several of the defendants, including GDOC and the GDOC Commisioner.  On the same day, Losey filed a second amended complaint, naming Officer Nail (and other individual correctional officers) for the first time.

On August 10, 2012, the defendant officers filed their Answer and removed the action to the United States District Court for the Northern District of Georgia.  On August 23, 2012, the case was transferred to the Southern District of Georgia, where SSP is located.

The defendants filed dispositive motions.  The defendant Warden filed a Motion to Dismiss and the defendant officers filed a Motion for Judgment on the pleadings.  After referring the case to a magistrate judge, the district court entered two orders.  On October 24, 2012, the district court adopted the Report and Recommendation of the magistrate judge and granted the defendant Warden's Motion to Dismiss.  On November 20, 2012, the district court adopted a separate Report and Recommendation and granted the defendant officers' Motion for Judgment on the Pleadings.  On December 14, 2012, Losey timely appealed both orders.

## F.    Initial Appeal Before This Court

On June 4, 2013, this Court affirmed the dismissal of all claims against the Warden and the other defendant officers, but held that the district court erred in granting the Motion for Judgment on the Pleadings in favor of Officer Nail.  Losey v. Warden, 521 F. App'x 717, 720 (11th Cir. 2013).

This Court recited the factual allegations in Losey's complaint against defendant Officer Nail as follows: (1) "that Officer Nail conducted an unofficial count on the night he was raped, walking directly past the cell in which he was being held"; (2) "at the time that Officer Nail was conducting the count, Mr. Whitehead was holding down Mr. Losey and covering his mouth, which Officer Nail would have seen had she looked into the cell"; "that unofficial counts

8

typically involve officers walking cell-to-cell and looking into the window of each cell to check on the status and whereabouts of each inmate"; and (4) "that Officer Nail 'either looked into the cell and did not care what she saw, or she did not care to look at all[.]' " Id. The Court concluded that, "[i]f true, these allegations show that Officer Nail knew of a substantial risk of serious harm to Mr. Losey and failed to intervene to prevent his rape." Id. The case against Officer Nail was thus remanded to the district court for further proceedings.

### G.    District Court Proceedings on Summary Judgment

On May 2, 2014, after the parties conducted discovery, Officer Nail filed a Motion for Summary Judgment. On July 7, 2014, the magistrate judge issued a Report and Recommendation that Officer Nail's motion be granted. On August 18, 2014, the district court adopted the Report and Recommendation and granted summary judgment to Officer Nail.

On August 21, 2014, Losey timely appealed.

## II.  DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a).[2] There is only a "genuine" dispute as to a material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)). The court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." Id.

"The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact." Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986)). If the nonmoving party would have the burden of proof at trial, the moving party may satisfy this initial burden either by producing "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial" or by showing that "there is an absence of evidence to support the nonmoving party's case." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437–38 (11th Cir. 1991) (quotation marks omitted). If the moving party satisfies its burden by either method, the burden shifts to the nonmoving party to show that a genuine issue remains for trial. Id. at 1438.

---

[2] We review the district court's grant of summary judgment de novo, viewing the facts and drawing all reasonable inferences in the light most favorable to Losey, the nonmoving party. Goodman, 718 F.3d at 1331.

At this point, the nonmoving party must " 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553).

## B.    Eighth Amendment Standard

The Eighth Amendment "imposes a duty on prison officials" to "take reasonable measures to guarantee the safety of the inmates." Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099-100 (11th Cir. 2014) (quoting Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (quotation marks omitted and alterations adopted)). In particular, under the Eighth Amendment, "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." Farmer, 511 U.S. at 833, 114 S. Ct. at 1976 (quotation marks omitted and alterations adopted). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." Id. at 834, 114 S. Ct. at 1977.

A prison official violates the Eighth Amendment "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003) (quotation marks omitted and alterations adopted) (emphasis

11

added).  To survive summary judgment on a failure-to-protect claim under the

Eighth Amendment, "a plaintiff must produce sufficient evidence of (1) a

substantial risk of serious harm; (2) the defendants' deliberate indifference to that

risk; and (3) causation."  Goodman, 718 F.3d at 1331 (quotation marks omitted).

"The second element—that [a prison official] evidenced a deliberate

indifference to a serious risk that [a prisoner] would be injured—forms the crux of

the matter at hand."  Id.  The prison official must "actually (subjectively) know[ ]

that an inmate is facing a substantial risk of serious harm, yet disregard[ ] that

known risk by failing to respond to it in an (objectively) reasonable manner."

Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 617 (11th Cir. 2007).  With

regard to the subjective component of the defendant's actual knowledge, the

defendant "must both be aware of facts from which the inference could be drawn

that a substantial risk of serious harm exists, and [s]he must also draw the

inference."  Farmer, 511 U.S. at 837, 114 S. Ct. at 1979.

Moreover, this must be shown by "conduct that is more than gross

negligence."  Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir. 2010).

"[T]he deliberate indifference standard—and the subjective awareness required by

it—is far more onerous than normal tort-based standards of conduct sounding in

negligence: 'Merely negligent failure to protect an inmate from attack does not

12

justify liability under [§] 1983.' " <u>Goodman</u>, 718 F.3d at 1332 (quoting <u>Brown v. Hughes</u>, 894 F.2d 1533, 1537 (11th Cir. 1990)).

**C.    Our Analysis**

Here, Losey presents no evidence that Officer Nail actually knew of the danger Losey faced on the night of July 8, 2010.  There is no allegation of any prior attack on Losey by Whitehead to put any prison official or correctional officer on notice.  Losey does not claim that he alerted any officer, much less Officer Nail, that he was in danger.  To the contrary, prior to the attack, Losey freely and often went in and out of Whitehead's cell.  Even Losey himself had no knowledge of a substantial risk of rape.  And certainly neither did Officer Nail.

As a result, Losey is left to argue (1) that Officer Nail, during her census count, looked into the cell and witnessed the rape in progress or (2) that Officer Nail failed to look in the cell and thus failed to notice the rape as a result of some dereliction of duty.  While Losey made these allegations in his second amended complaint, those claims fail based on the summary judgment record.

Indeed, Losey himself now admits that he cannot clearly identify who was at the window during the attack.  He did not see the officer's face.  He initially identified the officer as being white, but Officer Nail is African-American.  And Officer Nail denies she saw any such attack.

13

This leaves Losey's claim that Officer Nail conducted her census count, but failed to even look into the cell during that census count.  This claim also fails for lack of any evidence.  Losey admits that he cannot specify the exact time of the rape.  Losey went into Whitehead's cell between 8:00 p.m. and 9:00 p.m., waited to make his three calls on the contraband cellphone, and the rape occurred an indeterminate time later.  Officer Nail did not begin her shift until 10:00 p.m.  Officer Nail's census count was completed around 11:30 p.m. (her testimony shows that census count usually takes place around 11:25 p.m.) and there is no evidence that the rape was between 11:00 p.m. and 11:30 p.m.

In any event, even if Officer Nail failed to look into the cell during the census count and even if the rape was still ongoing during the few seconds she was supposed to look into the cell, there would still be no issue of fact as to actual knowledge that inmate Whitehead posed a substantial risk of serious harm to Losey.

This Court has held that "the fact that [ ] officers deviated from policy or were unreasonable in their actions—even grossly so—does not relieve [the plaintiff] of the burden of showing that the officers were subjectively aware of the risk; in other words, he cannot say, 'Well, they should have known.' " Goodman, 718 F.3d at 1334.  In Goodman, we explained that "[w]ere we to accept that theory of liability, the deliberate indifference standard would be silently metamorphosed

14

into a font of tort law—a brand of negligence redux—which the Supreme Court has made abundantly clear it is not." Id.  And we added that, "[a]lthough we view the evidence and draw all inferences in the light most favorable to [the plaintiff], we cannot reasonably base an inference on mere supposition, and nothing in this record creates a genuine issue of fact as to whether [the defendant officers] were subjectively aware of a substantial risk of serious harm to [the plaintiff]." Id.

That is this case.  It is easily distinguished from cases where the individual defendants had a clear awareness of specific danger of an inmate-on-inmate attack. See Caldwell, 748 F.3d at 1101 (holding summary judgment inappropriate where defendants knew of attacker's violent past, of specific "targeting" of the plaintiff, and that plaintiff "feared for his life" when prison officials returned him to a cell with the attacker).

In short, Officer Nail's failure to look into a cell during a census count does not show that Officer Nail had subjective awareness of a substantial risk of serious harm to Losey, and because the legal standard for deliberate indifference requires more than even gross negligence in the execution of Officer Nail's required duties, and thus "the law compels that we affirm the judgment of the district court." Goodman, 718 F.3d at 1329.[3]

---

[3]Because Losey's Eighth Amendment claim of deliberate indifference fails, Officer Nail has no need of qualified immunity, so we do not separately address it. See Carter, 352 F.3d at 1350 n.10.

## III.  CONCLUSION

For the foregoing reasons, we find no reversible error and affirm the district court's grant of summary judgment in favor of defendant Officer Nail.

**AFFIRMED.**