Citation Nr: AXXXXXXXX
Decision Date: 10/29/21 Archive Date: 10/29/21

DOCKET NO. 190829-28458
DATE: October 29, 2021

ORDER

Service connection for tinnitus is granted.

Service connection for bilateral hearing loss is denied.

Service connection for heart disease is denied.

Service connection for left knee injury residuals of osteoarthritis (left knee disability) is denied.

Service connection for hyperlipidemia is denied.

FINDINGS OF FACT

1. The totality of the evidence shows that the Veteran's tinnitus first manifested during active service and has persisted in a continuous manner since his separation from active military service. 

2. The totality of the evidence does not show the Veteran's bilateral hearing loss to be related to his active military noise exposure.

3. The totality of the evidence does not show the Veteran's heart disease to be related to his active military service. 

4. The totality of the evidence does not show the Veteran's left knee disability to be related to his active military service. 

5. Hyperlipidemia is a laboratory finding and is not considered to be a disability for VA purposes that is eligible for service connection. 

CONCLUSIONS OF LAW

1. The criteria for service connection for tinnitus have been met. 38 U.S.C. § 1131; 38 C.F.R. § 3.303.

2. The criteria for service connection for bilateral hearing loss have not been met. 38 U.S.C. § 1131; 38 C.F.R. § 3.303.

3. The criteria for service connection for heart disease have not been met. 38 U.S.C. § 1131; 38 C.F.R. §§ 3.303, 3.307(a)(3), 3.309(a), 3.309(e).

4. The criteria for service connection for left knee injury residuals of osteoarthritis (left knee disability) have not been met. 38 U.S.C. § 1131; 38 C.F.R. §§ 3.303, 3.307(a)(3), 3.309(a).

5. The criteria for service connection for hyperlipidemia have not been met. 38 U.S.C. § 1131; 38 C.F.R. § 3.303.

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Veteran served on a period of active duty for training (ACDUTRA) in the U.S. Army National Guard from January 1960 to July 1960. He served on active duty in the Army from November 1960 to January 1962. 

The rating decision on appeal was issued in July 2019 and constitutes an initial decision; therefore, the modernized review system, also known as the Appeals Modernization Act (AMA), applies. 

In the August 2019 VA Form 10182, Decision Review Request: Board Appeal, the Veteran elected the Hearing docket. Therefore, the Board may only consider the evidence of record at the time of the agency of original jurisdiction (AOJ) decision on appeal, as well as any evidence submitted by the Veteran or his representative at the hearing or within 90 days following the hearing. 38 C.F.R. § 20.302(a). 

The Veteran provided testimony at a July 2021 Board hearing before the undersigned Veterans Law Judge. A transcript of the hearing is of record.

Service Connection

Service connection will be granted if the evidence demonstrates that a current disability resulted from an injury or disease incurred in or aggravated by active military service. 38 U.S.C. § 1131; 38 C.F.R. § 3.303.

Service connection requires competent evidence showing: (1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service. Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004).

Service connection may also be established with certain chronic diseases, based upon a legal presumption, which occurs by showing that the disorder manifested itself to a degree of 10 percent disabling or more within one year from the date of separation from service. 38 U.S.C. §§ 1101, 1112, 1113, 1137; 38 C.F.R. §§ 3.307(a)(3), 3.309(a).

Additionally, service connection may be established under 38 C.F.R. § 3.303(b), when a symptom or symptoms of a chronic disease are noted in service, or within a year of the date of separation from service, and when chronicity is established through a continuity of symptomatology after service. The continuity of symptomatology provision is an alternative method to establishing service connection for the specific chronic diseases listed under 38 C.F.R. § 3.309(a). See Walker v. Shinseki, 718 F.3d 1331 (Fed. Cir. 2013).

As well, service connection may be granted on a presumptive basis for certain diseases resulting from exposure to an herbicide agent (including Agent Orange) for Veterans who, during active military, naval, or air service, served in the Republic of Vietnam between January 1962 and May 1975, so long as the requirements of 38 U.S.C. § 1116 and 38 C.F.R. § 3.307(a)(6)(iii) are met, and the rebuttable presumption provisions of 38 U.S.C. § 1113 and 38 C.F.R. § 3.307(d) are also satisfied. 38 C.F.R. § 3.309(e). Service in Vietnam includes the landmass and the territorial sea, which is defined as the 12 nautical miles surrounding Vietnam. See Procopio v. Wilkie, 913 F.3d 1375-1376, 1379-1380 (Fed. Cir. 2019).

1. Service Connection Tinnitus

At the July 2021 hearing before the Board, the Veteran testified that he started to notice ringing in his ears during his active military service. He noted that he had not been given hearing protection in the service, and that he would practice with guns about every three months. The Veteran was questioned about his most recent VA tinnitus examination, at which he reported that he had noticed his tinnitus for about five years. The Veteran clarified that he told the examiner that it had started getting worse five years prior to the examination. However, he explained his tinnitus began during his service, and had been generally consistent over the years since service, except for it being a little worse in his left ear than in his right ear. The Veteran's DD 214 reflects an MOS of cook with an artillery battalion. By granting the Veteran the benefit of the doubt, military noise exposure is conceded.

Tinnitus is a type of disorder that is associated with symptoms of lay observation. See Charles v. Principi, 16 Vet. App. 370, 374 (2002). The Veteran has reported both experiencing tinnitus during military service, as well as having experienced it in a continuous manner since his service. It is noted that the Board found the Veteran's testimony regarding the onset of the ringing in his ears to be more lucid than his testimony regarding other disabilities. As such, service connection for tinnitus is granted. 

2. Service Connection Bilateral Hearing Loss

The Veteran asserts that he has bilateral hearing loss that is related to his active military service. At the July 2021 Board hearing, the Veteran reported that he started to notice hearing loss while he was in the service. As noted above, military noise exposure has been conceded. 

However, in-service noise exposure on its own is not enough to grant service connection for bilateral hearing loss. For service connection to be warranted, it must be shown that the in-service noise exposure caused a current bilateral hearing loss disability. The Veteran most recently underwent a VA examination in June 2019. The audiometric findings from the VA examination show the Veteran to have bilateral hearing loss for VA purposes.

For VA purposes, impaired hearing will be considered to be a disability when the auditory threshold in any of the frequencies 500, 1000, 2000, 3000, 4000 Hertz is 40 decibels or greater; or when the auditory thresholds for at least three of the frequencies 500, 1000, 2000, 3000, or 4000 Hertz are 26 decibels or greater; or when speech recognition scores using the Maryland CNC Test are less than 94 percent. 38 C.F.R. § 3.385. Further, the United States Court of Appeals for Veterans Claims (Court) has indicated that the threshold for normal hearing is between 0 and 20 decibels and that higher thresholds show some degree of hearing loss. Hensley v. Brown, 5 Vet. App. 155, 157 (1993). When audiometric test results at a Veteran's separation from service do not meet the regulatory requirements for establishing a "disability" at that time, a Veteran may nevertheless establish service connection for a current hearing disability by submitting evidence that the current disability is causally related to service. Hensley, at 160.

Here, the Veteran's service treatment records (STRs) show the results of whisper voice testing at the Veteran's enlistment examination and audiometric testing at his discharge examination. However, it is unclear whether such thresholds were recorded by using American Standards Association (ASA) units or International Standards Organization-American National Standards Institute (ISO-ANSI) units. Therefore, the Board will consider the recorded metrics under both standards, relying on the unit measurements most favorable to the Veteran's appeal. As it relates to VA examinations and VA records, audiological reports were routinely converted from ISO-ANSI results to ASA units until the end of 1975 because the regulatory standard for evaluating hearing loss was not changed to require ISO-ANSI units until September 9, 1975.

In light of the above, and where necessary to facilitate data comparison for VA purposes in the decision below, including under 38 C.F.R. § 3.385, audiometric data originally recorded using ASA standards will be converted to ISO-ANSI standard by adding between 5 and 15 decibels to the recorded data as follows:

 Hertz 250 500 1000 2000 3000 4000 6000 8000

Add 15 15 10 10 10 5 10 10

Here, when the conversion is made, the Veteran's hearing acuity at separation showed the following decibel loss:

 HERTZ

 500 1000 2000 4000

RIGHT 20 20 10 20

LEFT 10 10 10 15

 

As such, the Veteran was not shown to have any impairment in hearing acuity at the time of his discharge.

The Veteran's Maryland CNC Word List speech recognition score and puretone thresholds, in decibels, from the June 2019 VA examination were as follows:

 HERTZ

 1000 2000 3000 4000 Avg CNC

RIGHT 45 40 45 55 46 96

LEFT 45 45 55 55 50 36

As such, the Veteran has a current bilateral hearing loss disability for VA purposes. Therefore, the question for the Board is whether there is a causal relationship between the Veteran's current bilateral hearing loss and his military noise exposure. 

A Veteran may show that hearing loss is the result of military noise exposure and that some hearing impairment at separation marks the onset of hearing loss which appears decades later, however, this has not been done in this case. 

As previously noted, the Veteran underwent a VA examination in June 2019, at which he reported that he was around Howitzer fire while he was stationed in Germany. Supposedly, the Howitzers were located about 1/2 mile away, and would be shot about once per month. The examiner found that it was less likely than not (less than 50 percent probability) that the Veteran's bilateral hearing loss was incurred in or a result of his active military service. The examiner explained that at the Veteran's separation hearing test the findings indicated thresholds within normal limits. While the Veteran reported Howitzer blasts, there was no evidence of acoustic trauma noted with the normal hearing thresholds. Additionally, the Howitzer noise was relayed to have occurred 1/2 mile away once per month. Thus, the distance from the blast was less likely to cause acoustic trauma. The Board finds probative value in the VA examiner's rationalized opinion. 

Further review of the Veteran's medical treatment records does not provide any findings of any greater significance than those relayed above. That is, there is no objective medical evidence linking the Veteran's bilateral hearing loss to his active military service. As such, service connection for bilateral hearing loss is not warranted. 

Consideration is given to the Veteran's contention that his bilateral hearing loss was caused by his active military service. While lay persons are competent to provide opinions pertaining to certain medical issues, the etiology of bilateral hearing loss, as is specific to this case, is outside the realm of common knowledge for someone who does not possess medical training, specialized expertise, or experience. Jandreau v. Nicholson, 492. F.3d 1372, 1377 n.4 (Fed. Cir. 2007). As such, the Veteran's contentions do not provide any probative value as to the etiology of his bilateral hearing loss. 

While a lay person is considered to be competent to provide reports of diminished hearing acuity, in this case audiometric testing at separation failed to show hearing loss. As such, there is not a showing of continuity of symptomatology between service and the clinical onset of hearing loss years later.

Accordingly, service connection for bilateral hearing loss is denied.

3. Service Connection Heart Disease

The Veteran asserts that he has heart disease that is related to his active military service. Specifically, he contends that he was exposed to Agent Orange while serving in the Republic of Vietnam. At the July 2021 Board hearing, the Veteran reported that he started having chest pains in 1974. He also indicated that he had reported having some light chest pains while he was in the Army, but was reportedly told it was all in his head. Additionally, he stated that he had been told it was acid, but the chest pains had continued to get worse. After his service, he was first seen for a heart condition in 1974, when he underwent bypass surgery. 

The Veteran has contended that he served in the Republic of Vietnam, purportedly in 1961. He asserted that while he was stationed in Germany, President Kennedy had come over to extend everyone's service in Germany by six months. While the President was there, the Veteran stated that he had cooked for him on three separate occasions. On the third occasion, the President allegedly told the Veteran that he had a special job for him, which was top secret. The Veteran indicated that two weeks later, he and eight other soldiers, whose names he reported he did not know, were sent to Da Nang, Vietnam. Upon arrival, they got in a helicopter and were taken to the DMZ. He said that while he was in the DMZ, he was sprayed with Agent Orange by airplanes that were spraying to get rid of the shrubbery so that they could see. He further explained his location as being 50 miles north of Da Nang and 20 miles from the DMZ Zone, Quang Tri. He stated that he was there for about two weeks, until December 21, 1961. While the Veteran relayed that he had not been initially told why he had been sent to Vietnam, in retrospect, he described the purpose of the trip as being to take over a French camp. The French had left several years before, and they were there to take over the camp because the war was starting again.

He explained that there were no records or any supporting evidence of his service in the Republic of Vietnam. The Veteran reported that he had called archives in St. Louis, and had been told that there were no records kept from 1961 or 1962 of military in Vietnam. He also noted a fire at the National Personnel Records Center in St. Louis, and that some records disappeared. In addition, the other individuals who had gone to Vietnam with him were all now dead. Supposedly, they had all passed away from exposure to Agent Orange. The Veteran explained that he had gotten a list of all their names, which he could no longer find, and had called around and found out that they were all deceased.

The Veteran's VA treatment records reflect that at a follow-up mental health appointment in February 2010, the Veteran reported that he had bent sent to Hanoi in the Republic of Vietnam from Berlin while assisting in the setting up of a ramp for the mess hall. The Veteran was seen in September 2013 for an Agent Orange evaluation. At the appointment the Veteran reported that he served in the Republic of Vietnam at Hanoi around January 1961 for about three to four months for a police action assignment. The examiner indicated however, that the Veteran circled his location on a map as Qui Nhon. The Agent Orange registry was not completed, as the Veteran was not shown to have sufficient evidence to support service in Vietnam. 

There are no indications in the Veteran's military personnel file or his STRs of any service in the Republic of Vietnam. His personnel file reflects that he served in a Howitzer battalion stationed in Nurnberg Germany from March 1961 to January 1962. Additionally, the Veteran's reports of his purported service in the Republic of Vietnam are not consistent. No fellow Veterans can vouch for his service in the Republic of Vietnam, as the Veteran reported that all eight who were indicated to have served with him are purportedly dead. Unfortunately, the evidence reflects the Veteran to be an inaccurate historian pertaining to service in the Republic of Vietnam. For example, he testified that he went to Vietnam with 8 others, whose names he does not recall; yet, he also stated that he had called around and found out that all of them had died of Agent Orange exposure. This contradictory testimony is found to be highly implausible, and unreliable, and thus is not found to be probative. As the evidence does not show the Veteran to have service in the Republic of Vietnam, service connection on a presumptive basis is not warranted.

Service connection on a direct basis is not warranted either. A review of the Veteran's STRs does not show any diagnoses for heart disease, nor do they reflect any complaints or treatments that may be related to the later development of heart disease. The Veteran was seen on June 26, 1960 with complaints of his chest hurting, a headache, and being unable to sleep for the past two days. On the same day he was assessed with an upper respiratory infection. A routine chest exam from August 1961 was negative, as was his chest exam for his separation from November 1961. On the Veteran's Report of Medical History for separation from January 1962, the Veteran did not report any issues that may relate to heart disease, including any complaints of chest pain, while he did note other issues. The Veteran's private treatment records reflect that the Veteran was first seen on July 26, 1974, for complaints of chest pain, dyspnea, diaphoresis, and left arm numbness. A diagnosis of myocardial ischemia was rendered. This was more than twelve years after his discharge from active military service. There is no objective medical evidence contained within the Veteran's VA or private treatment records suggesting that his heart disease should be linked to his active military service. 

Consideration is given to the Veteran's contentions that his claimed heart disease was incurred in or caused by his military service, to include exposure to herbicides. While lay persons are competent to provide opinions pertaining to certain medical issues, the etiology of heart disease, as is specific to this case, is outside the realm of common knowledge for someone, such as the Veteran, who does not possess medical training, specialized expertise, or experience. Jandreau v. Nicholson, 492. F.3d 1372, 1377 n.4 (Fed. Cir. 2007). As such, no probative value shall be assigned to the Veteran's assertions pertaining to the etiology of his heart disease.

Based upon the foregoing, service connection for heart disease is not warranted, and the claim is denied.

4. Service Connection Left Knee Disability

The Veteran asserts that he has a left knee disability that is related to his active military service. As previously noted, the Veteran reported at the July 2021 Board hearing that he served in the Republic of Vietnam. However, the evidence reflects the Veteran to be an inaccurate historian pertaining to his service in the Republic of Vietnam. 

Nevertheless, at the July 2021 Board hearing, the Veteran described being shot in his left kneecap from a sniper while serving in the Republic of Vietnam. After he was shot, his Lieutenant supposedly laughed at him, and the Veteran "knocked him out cold." The Veteran described having his knee wrapped up and then being sent back to Germany immediately because they did not want any records of the incident. Once he got back to Germany, his knee was fixed up a little bit, but it was just wrapped up, and then he was sent to New York City to be discharged. The Veteran further stated that when he returned to Germany from Vietnam, they said that he had broken his leg, and they did not put in his records that he had been shot. The Veteran was questioned about a statement in his record where he had reported breaking his leg falling down a flight of stairs after having an epileptic seizure. The Veteran testified that he was not aware of ever being diagnosed with epilepsy, and that he had not fallen down a flight of stairs and broken his leg while in Germany. In an application for service connection submitted in March 1971, the Veteran had reported that in October 1961 when he was stationed in Germany, he had been suffering from epileptic spells. During one spell, he stated that he fell down a flight of stairs and broke his leg.

The Veteran's STRs reflect a report that the Veteran fell down a flight of stairs and landed on his right foot in July 1961. A sprained ankle was noted with a boot/walking cast for three weeks. Notations pertaining to hyperventilation and passing out are also contained within the Veteran's STRs. In October 1961, an episode of hyperventilation is indicated to have caused the Veteran to have fallen on his right hand and his right thumb. The Veteran also fell down the stairs of the mess hall in December 1961, leaving him with pain over the left lower rib cage. While the Veteran's record does indicate that he fell down some stairs on more than one occasion, none of the records show him to have broken his leg. One incident shows a right ankle sprain, but not a broken leg. In addition, his records do not show any reports of a gunshot wound, or any treatment to the Veteran's left knee at any time during his service. On the Veteran's Report of Medical History for separation from January 1962, the Veteran did not report any issues that may relate to a left knee injury, while he did note other issues. 

The Veteran's VA treatment records reflect that at an August 2009 mental health appointment, the Veteran relayed that he was sent from Germany to Vietnam for three weeks in 1960 to be "police officers," and while there he was shot in the left knee. At a February 2010 mental health appointment, the Veteran reported being shot in February or March 1960 after being sent for temporary duty to Hanoi from Berlin while assisting in setting up a ramp for the mess hall. He thinks that he was hit by sniper fire. He relayed being treated in a medical tent in Vietnam, and then being sent to Nuremburg Germany for further treatment and rehabilitation. He stated that there was a "bubble," and that the medical people had replaced his kneecap and sewn him up. Pertaining to diagnoses, a past medical history list from September 2012 notes intern derangement knee from February 2004, and a surgical procedure list from May 2019, notes three left knee arthroscopies from August 2004, April 2005, and June 2005. These are the earliest dated diagnoses and treatment for the Veteran's knee in his treatment records. 

The Veteran submitted a statement from a personal physician dated November 19, 2018, in which the physician reported that the Veteran underwent a total left knee arthroplasty in February 2018. The Veteran was noted to have advanced degenerative changes involving the knee. The physician indicated that the Veteran had reported that he had spent time in Vietnam in 1962, and that he had been shot in the left knee. Afterwards he was promptly returned to Germany and treated surgically. The physician stated that during his evaluation of the Veteran, radiographic and intraoperative findings of the knee could certainly be consistent with a previous gunshot injury. The physician indicated that he was not aware of any other definitive diagnostic test to determine the etiology of the Veteran's knee arthritis.

Based upon the foregoing, service connection for a left knee disability is not warranted. The Veteran has been shown to be an inaccurate historian pertaining to his reported service in the Republic of Vietnam. In addition, his explanations of his injury, other than a purported gunshot, are not consistent throughout the record and show significant inaccuracies. These inaccuracies are evidenced in the Veteran's reports about when he was supposedly sent to the Republic of Vietnam, how long he was sent for, and why he was sent. There is also no evidence within the Veteran's military personnel file or STRs to provide any weight to his statements, as these records do not show the Veteran to have ever served in the Republic of Vietnam or to have ever injured his left knee during his military service. While the Veteran has submitted a statement from a private physician, the statement is based upon the Veteran's discredited reports of serving in the republic of Vietnam and being shot in the left knee. Additionally, the physician only states that the findings pertaining to the Veteran's left knee could be consistent with a previous gunshot injury. This statement does not rise to a level that would warrant service connection, nor does it suggest that a remand is warranted for a VA examination, as the evidence of record reflects the Veteran as an inaccurate historian.

The fact remains that while the Veteran reported that he was shot in the knee and that the injury was covered up as a broken leg, the service treatment records clearly show that the Veteran experienced epileptic spells while stationed in Germany, which resulted in several falls. The Veteran testified that the "broken leg" was an effort to cover up the gun shot wound, but this is inconsistent with the fact that the Veteran actually filed for epilepsy, not a gun shot wound, in the decade after separation. This undermines his contention now that he was shot in the knee.

Consideration is given to the Veteran's contentions that his claimed left knee disability was incurred in or caused by his military service. While lay persons are competent to provide opinions pertaining to certain medical issues, the etiology of a left knee disability, as is specific to this case, is outside the realm of common knowledge for someone, such as the Veteran, who does not possess medical training, specialized expertise, or experience. Jandreau v. Nicholson, 492. F.3d 1372, 1377 n.4 (Fed. Cir. 2007). As such, no probative value shall be assigned to the Veteran's assertions pertaining to his left knee disability.

Accordingly, service connection for a left knee disability is denied. 

5. Service Connection Hyperlipidemia

The Veteran asserts that he has hyperlipidemia that is related to his active military service. At the July 2021 Board hearing, there was some confusion as to whether the Veteran was trying to testify pertaining to a disability of hyperlipidemia or a disability of hyperventilation. The Veteran's representative clarified to the Veteran that he had filed for service connection for hyperlipidemia, which was the issue that was on appeal. It was explained to the Veteran that hyperlipidemia is not a disability that VA will grant service connection for, as VA law restricts claims for service connection to those that involve a current qualifying disability. See Moore v. Nicholson, 21 Vet. App. 211, 215 (2007) ("Compensation for service-connected injury is limited to those claims which show a present disability."); see also Brammer v. Derwinski, 3 Vet. App. 223, 225 (1992) ("Congress specifically limits entitlement for service-connected disease or injury to cases where such incidents have resulted in a disability.").

Under the applicable regulations, the term "disability" means impairment in earning capacity resulting from diseases and injuries, and their residual conditions. See 38 C.F.R. § 4.1; see also Hunt v. Derwinski, 1 Vet. App. 292, 296 (1991); Allen v. Brown, 7 Vet. App. 439 (1995). Hyperlipidemia is classified as a laboratory finding and is not appropriate for the rating schedule to address. See 61 Fed. Reg. 20,440-20,445 (May 7, 1996). 

As hyperlipidemia is not a disability for VA purposes, the Veteran has not presented a valid claim for service connection in relation to this issue. See Brammer, 3 Vet. App. at 225. Thus, the claim for service connection for hyperlipidemia is denied. 

 

 

MATTHEW W. BLACKWELDER

Veterans Law Judge

Board of Veterans' Appeals

Attorney for the Board S. Lutgens-Staley, Associate Counsel

The Board's decision in this case is binding only with respect to the instant matter decided. This decision is not precedential and does not establish VA policies or interpretations of general applicability. 38 C.F.R. § 20.1303.