[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 17-11785

————————————————

D.C. Docket No. 6:14-cv-00046-JRH-GRS

DARIUS ISHUN GREEN,

                                                    Plaintiff–Appellant,

versus

WARDEN BRAD HOOKS,
DEPUTY WARDEN JOHN BROWN,
LIEUTENANT TORIE GRUBBS,
GEORGIA DEPARTMENT OF CORRECTIONS,

                                                    Defendants–Appellees.

————————————————

Appeal from the United States District Court
for the Southern District of Georgia

————————————————

(January 6, 2020)

Before ROSENBAUM, BRANCH, and TJOFLAT, Circuit Judges.

BRANCH, Circuit Judge:

After being sexually assaulted by a fellow inmate at Rodgers State Prison, Darius Green brought suit under 42 U.S.C. § 1983, against Georgia Department of Corrections ("GDC") employees Warden Bradley Hooks, Deputy Warden of Security John Brown, and Lieutenant Torie Grubbs (collectively, "the prison officials").  First, Green asserted that the prison officials were deliberately indifferent to the risk of harm against Green, in violation of the Eighth Amendment.  Second, under a theory of supervisory liability, Green alleged that the prison officials proximately caused Green's injuries.[1]

The prison officials filed a motion for summary judgment, arguing that they did not violate the Constitution and that they were nevertheless immune from suit because they are entitled to qualified immunity.  The district court granted summary judgment in favor of the prison officials, finding that no constitutional violation had occurred.  The district court also dismissed Green's supervisory liability claims.  Alternatively, the district court found that the prison officials were entitled to qualified immunity.  Green appealed.

After careful review of the record and with the benefit of oral argument, we affirm the district court's grant of summary judgment in favor of the prison officials.

---

[1] Green also initially brought a conspiracy claim against Lieutenant Grubbs, but later abandoned it.

2

## I.    BACKGROUND

### 1.  Facts

Darius Green is transgender.[2]  Born biologically male, Green identifies with the female gender.  Green has been taking hormone replacement therapy since age 17, has breasts, and maintains a feminine appearance.[3]

On May 10, 2012, Green formally entered the GDC through a standard intake procedure performed at the Georgia Diagnostic and Classification Prison ("GDCP").  Here, inmates undergo housing and classification prior to their placement in the Georgia prison system.  The process takes into account the inmate's criminal history; individual characteristics; and treatment needs, including an inmate's medical and mental health needs.  The intake process also provides an initial security classification, which is a comprehensive measure of risk that impacts an inmate's housing assignment, levels of supervision, and work detail assignment.[4]  Green's

---

[2] Because Green's counsel, counsel for Defendants-Appellants, and the district court have exclusively used the feminine pronoun to refer to Green, for clarity, we will also do so.

[3] However, when entering the GDC on May 10, 2012, Green was not taking hormone replacement therapy ("HRT").  In fact, Green had not been taking HRT for approximately eight months prior to arrival at the GDC and did not receive HRT until after transfer to Rodgers State Prison.  Because Green did not arrive at Rodgers State Prison until July 2012, it appears that Green was not on HRT for approximately 11 months prior to arriving at Rodgers.

[4] Factors include: severity of the current offense, severity of prior offenses, history of escape, history of institutional violence, along with any information regarding gang affiliation and activities.

intake resulted in a minimum-security classification and a finding that Green was fit for housing in the general population of male prisoners.

GDCP also screens inmates in accordance with the Prison Rape Elimination Act ("PREA"), 28 C.F.R. § 115 *et seq.*, to determine if they are at risk of being either a sexual victim or a sexual aggressor. PREA screening considers a variety of relevant factors, including whether an inmate has a disability; an inmate's age, physical build, incarceration history, criminal history, and prior experiences of sexual victimization; an inmate's actual and/or perceived sexual orientation and gender identity; and the inmate's own perception of vulnerability. *See generally id.* § 115.41(d). When assessing inmates for risk of being sexually abusive to others, PREA screening also considers "prior acts of sexual abuse, prior convictions for violent offenses, and history of prior institutional violence or sexual abuse, as known to the agency." *Id.* § 115.41(e). Green was not designated as a PREA victim or as a PREA aggressor. Green also received institutional orientation, including PREA orientation, and was informed about how to make a report of sexual assault.

On July 19, 2012, Green was transferred to Rodgers State Prison ("Rodgers"). Rodgers is a medium-security facility for male felons and houses approximately 1,500 inmates in six buildings (Buildings A through H). Green, at all times relevant to this case, was placed in Building A, which was comprised of four dormitories

(A1, A2, A3, and A4).  A1 was a general population dormitory, while A3 and A4 were used for Administrative Segregation housing.

A1 housed inmates that were generally well-behaved, and all inmates were cleared to live with each inmate in the dormitory.  Although there were inmates with different security classifications in A1, both medium and minimum security inmates are deemed capable of abiding by rules and regulations of the prison.[5]  Inmates of differing security levels are routinely housed together, and this practice is not prohibited by PREA.

A1 was made up of two halls with two bedrooms per hall; each bedroom contained eight bunkbeds, housing a total of sixteen inmates per bedroom.  A1 also had a television room and day room.  The open format of A1 allowed for free roaming throughout the bedrooms, and prison security officers were not continuously present in the dormitory. Every day, officers conducted multiple "official counts" of inmates, entered A1 to deliver mail, conducted "census counts," and monitored the hallways and common areas via the A-dormitory control room.  Although the rooms in A1 had locks, the rooms were not locked during lights-out.

In contrast, Administrative Segregation units A3 and A4 were comprised of single- and double-occupancy rooms.  Inmates in Administrative Segregation were

---

[5] Green had a minimum-security classification and her assailant, Darryl Ricard, had a medium classification.

5

housed there for a variety of reasons: disciplinary purposes, pending investigation, pending protective custody review, protective custody, medical observation, and pending initial institutional classification. Prison policy required A3 and A4 security officers to perform security and safety checks every thirty minutes.

Upon arriving at Rodgers, Green was subjected to a strip search and was required to strip in front of the guards and other inmates who were being processed at the same time, which exposed her breasts to the individuals in the room. After processing at Rodgers, Green was placed in Administrative Segregation in A4 because of a bed shortage in general population. Green's institutional status at that time was designated as "pending reassignment," which is the status typically given when there is not enough bed space and an inmate is awaiting return to general population. Although Green's placement in A4 should have generated an initial assignment memorandum, this memorandum is missing.

After four days in Administrative Segregation, Green was transferred to A1 to be housed with the general population. The A1 unit generally housed inmates who were not considered to be problem inmates.

On Green's first day in A1, inmate Darryl Ricard approached Green to offer protection. Ricard identified himself as one of the nation's highest-ranking members of the Vice Lord gang. Ricard was serving a life sentence without parole for aggravated child molestation, aggravated assault, rape, and kidnapping of a child in

6

retaliation for her father's unpaid debts.    Ricard's security classification was medium, and he was deemed appropriate for general population housing.  Despite his rape and molestation convictions, Ricard's PREA screening did not designate him as a PREA victim or a PREA aggressor.[6]

Ricard told Green he was looking for a friend, and Green acquiesced.  It is undisputed that the initial encounter and proffered arrangement was unthreatening and non-coercive. However, within the next two weeks, Ricard demanded Green perform oral sex upon him.  Green initially resisted, but Ricard threatened Green with prison weapons,[7] physically assaulted Green in the bathroom, and threatened further bodily harm if Green refused to perform the demanded sexual acts.  Ricard also threatened to have Green harmed if Green transferred to another dormitory. Green's testimony indicates that she relented to Ricard's demands out of fear. Ricard disputes Green's testimony, and claims that he was Green's prison "husband," all sexual acts were consensual, and that Green admitted to Ricard she was setting him up so she could fabricate a lawsuit against Rodgers.

---

[6] Under PREA, a sexual abuse act or prior rape conviction does not automatically result in an inmate being labeled a "sexual aggressor."

[7] Green said Ricard "went berserk" and "went in his room, and brought a shank [a homemade knife] and a belt with a lock on it" to threaten Green.

7

On August 24, 2012, Green sent the following letter to her mother, Lisa Weaver (reproduced as written):

> Hello
> Mother, how are you? I am writing you now on an emergency basis I am in big need of help and it is life or death at this current time my life – is in great <u>danger</u>, listen I need for you to get me the address to the Dept of Correction, the address to the Commissoner the directors of the GA Department of Corrections something somebody I can write to get me an immediate transfer. I have to get transfered from this camp mother ASAP I don't want to go to the hole or P.C. unless it is absolutely necessary I have control of the situation for now but once I dont I might be seriously hurt or killed I am very scared but I am playing my part This is VERY Important I need those addresses ASAP
> I will explain the situation later
> Love you poohbear

Upon receiving this letter, Green's mother called Warden Bradley Hooks and informed him of the letter. On the same day—August 28, 2012—Warden Hooks had Green escorted to his office for a meeting. Deputy Warden John Brown was also in attendance. Although some specifics from that meeting are disputed,[8] it is undisputed that Green:

- Told Warden Hooks and Deputy Warden Brown that she "was okay"
- Never said she was in danger
- Never disclosed that she was being sexually assaulted
- Never disclosed that she was being sexually harassed
- Never mentioned Darryl Ricard's name

---

[8] Warden Hooks testified that he asked Green whether she was in any danger or wanted protective custody, but Green denies that Warden Hooks specifically asked about protective custody. Although this fact is disputed, it is not material to our inquiry, given the plethora of undisputed facts supporting Warden Hooks's inquiry into Green's safety.

8

- Never admitted to being uncomfortable in A1
- Never asked to be moved to a different building
- Never asked to be moved to a different camp
- Never asked to be moved into protective custody

Furthermore, Green admits to telling Warden Hooks, "I was okay[,] because I did not want to alarm him into investigating or making me have to tell him exactly what was going on."

In response to Green's statements that everything was "okay," Warden Hooks replied, "Well, I don't believe you. Your mother's calling saying this and that." Warden Hooks then called Green's mother directly and gave Green the opportunity to speak to her on the phone. Warden Hooks also spoke with Green's mother, relaying Green's statements that Green was okay and that there were no problems.

Green later said these denials stemmed from being scared, as Ricard had repeatedly threatened serious harm to Green if she resisted.[9] However, Green also testified that she would *never* have disclosed the information to officials—even if her mother had provided the requested addresses of GDC officials, stating: "I never would have told them what was going on. I just wanted to write them to see if they could help me without having to tell on [Ricard] or tell what was going on so that I

---

[9] During Green's Incident Report interview, made following Ricard's assault of Green on September 22, 2012, Green detailed the threats and said Ricard had threatened to "find people" who could hurt Green if Green moved buildings or to beat Green so badly she would have to be "put [] on a life flight."

9

wouldn't receive any retaliation from him because I was hoping that they would be able to help me without having to tell them what was going on."

After the phone call, Warden Hooks gave Green a piece of paper to take with her so other inmates would not be suspicious of Green's meeting with the Warden.

Following the meeting with Warden Hooks and Deputy Warden Brown, Green allegedly wrote a letter to Warden Hooks in early-to-mid-September 2012, raising general grievances with the prison's building design. In this letter, Green did not mention Ricard or the sexual acts Ricard was forcing Green to perform. Instead Green lodged a more general complaint that Rodgers was not conducive to transgender inmates. Specifically, Green identified the open showers, open dormitory, toilets without locks, and A1's general policy of not locking doors as being inappropriate for transgender inmates. In this letter, Green asked to be transferred. Green wrote the letter, placed it in an envelope addressed to Warden Hooks, and placed it in the prison mailbox. Warden Hooks denied receiving or reading the letter.

Later that month, on September 17, 2012, Green allegedly wrote another letter, this time to Deputy Warden Brown. The letter identified Ricard as Green's abuser and asked Deputy Warden Brown to handle the matter confidentially. In this letter, Green told Deputy Warden Brown that Ricard was forcing Green to perform oral sex on him. Green placed the letter in an envelope, wrote "confidential, urgent

10

– urgent confidential correspondence" on the outside, addressed it to "deputy warden of security," and placed it in the prison mailbox. Deputy Warden Brown denied ever receiving or reading the letter.

On September 20, 2012, three days after Green wrote the letter to Deputy Warden Brown, Green and two other inmates were forced to exit A1. In prison jargon, Green and the others were "put on the door," a phrase that refers to being expelled from the dormitory by the other inmates in the dormitory and being forced to stand on the outside of the dormitory door. According to Green, the three inmates were "put on the door" because the inmates of A1 were tired of having openly homosexual inmates in the dormitory. Green was relieved to be leaving A1 and viewed this occurrence as a chance to escape Ricard. But, upon hearing that Green and the two other inmates were being "put on the door," Ricard joined them on the door in solidarity. Together, the four inmates exited the dormitory and waited near the control room of the A Building.

Lieutenant Torie Grubbs received a report that several inmates had been "put on the door" and went to retrieve them. The inmates requested protective custody, telling Lieutenant Grubbs that they had been asked to leave. Green told Lieutenant Grubbs that she feared for her life as a transgender inmate, and Ricard told Lieutenant Grubbs that he feared for his life because he stood up for the homosexual inmates. Upon hearing this, Lieutenant Grubbs escorted the exiled inmates to

11

Administrative Segregation and placed all four inmates on "protective custody review" status.[10]  The only contact Lieutenant Grubbs had with the inmates who were "on the door" was when Grubbs escorted them from the door of A1 to the Administrative Segregation area.  Lieutenant Grubbs told another officer to place the inmates in Administration Segregation cells but did not make the cell assignments.  A different officer escorted the inmates into the Administrative Segregation building.

Another officer (not Lieutenant Grubbs) then escorted Green to the shower room of the A4 dormitory, while a different officer (also not Grubbs) escorted Ricard to a cell in the A3 dormitory.  Ricard was placed in Cell 22, Bed 44 in the A3 dormitory, which was a double-occupancy room.

From 11:00 p.m. on September 20, 2012, until 4:00 a.m. the following morning, Green waited in the shower room of A4 dormitory.  During this time, Green made no mention of Ricard at all, but instead wrote a statement outlining the experience of being "put on the door" and noting that "now A building is putting open homosexual/trans-gender inmates on the door only F building is allowing open homosexual on the door for now. This camp openly discriminate against open

---

[10] This status is given to inmates awaiting an assignment to protective custody.  Inmates seeking voluntary protective custody are asked to identify a specific threat justifying protective custody placement.  A Classification Committee then reviews an inmate's request for voluntary protective custody and determines which placement is appropriate.

homosexual and they dont want us here."    While in the shower room, Green acknowledges that she made small talk with officers, but did not mention Ricard or that Green was being sexually assaulted, harassed, or otherwise threatened.

At approximately 4:00 a.m. on September 21, 2012, Green was escorted by an unknown officer (who was not Warden Hooks, Deputy Warden Brown, or Lieutenant Grubbs) to Cell 22, Bed 43 in the A3 dormitory.  Ricard was already in the cell, which Green noticed when walking into the cell—but only after the officer had shut the door.  Ricard allegedly told Green that he had gotten Lieutenant Grubbs to place Green in the cell with him.[11]  Ricard attempted to talk to Green, but Green demurred and went to sleep.  Green then slept, undisturbed, for several hours.

While Green slumbered, Warden Hooks reviewed the Assignment Memos requesting voluntary protective custody for Green and Ricard.  The matter was sent to the Classification Committee for review and recommendation.  That same day, September 21, 2012, the Classification Committee recommended that both inmates be returned to general population.  Warden Hooks approved the recommendations of the Classification Committee, but Ricard and Green were not moved immediately

---

[11] Lieutenant Grubbs denied the allegation that Ricard had orchestrated Green's placement in Cell 22, and Ricard denied it as well. Ricard admitted that he may have asked to be placed in the cell with Green, but also noted that Rodgers officials would have "had no reason not to. I mean, we wasn't beefing or anything. They don't just—the only times these people—the Administration pays attention to who they place in a cell is if me and this guy right here just got into a big ass fight. . . . And that's the only reason that they would keep parties separated unless a PREA was, of course involved. Other than that, why would they separate us?"

because that day was not a day when routine inmate housing moves were typically made.

Upon awakening on September 21, 2012, Green told Ricard, "I don't want to be around you anymore, you know, because, you know, I can't deal with all the threats and all of the stuff that's going on." Ricard became distressed and agitated, and grabbed a razor blade. Ricard told Green he was tired of Green playing games with him. Ricard threatened Green with the razor blade, saying he would cut up Green's face. Against Green's will, Ricard then orally and anally sodomized Green. This assault occurred around midnight or 1 a.m. on September 22, 2012.

After the attack, Green secretly wrote a letter pleading for help. The letter stated "I'm being forced to have sex." About thirty to sixty minutes after the assault, Green was able to slip the letter out through the cell door when Ricard was not looking. Soon after the letter was slipped through the door, an officer took the letter, opened the cell flap, and asked who wrote the letter. The officer then left. Approximately two minutes later, a sergeant arrived at the cell to find Ricard chasing Green around the cell with a razor blade. After the sergeant threatened to pepper-spray Ricard through the cell flap, Ricard dropped the razor blade and was escorted out of the cell.

In response to Green's allegation of sexual assault, the prison's Sexual Assault Response Team conducted an investigation. This investigation began almost

14

immediately (mere hours after the assault occurred), and Green's interview with an Internal Affairs Investigator took place at 12:30 p.m. on September 22, 2012. The investigation substantiated Green's allegations of sexual assault.

Warden Hooks then referred the investigation to the GDC Internal Affairs Investigation unit, and a full investigation was conducted. Afterward, the Tattnall County District Attorney presented the case to two separate grand juries, in an attempt to indict Ricard. Both grand juries refused to indict.

### 2. Procedural History

In May 2014, Green filed suit in federal court under 42 U.S.C. § 1983 alleging that Warden Hooks, Deputy Warden Brown, and Lieutenant Grubbs were deliberately indifferent to Green's safety, in violation of Green's rights under the Eighth and Fourteenth Amendments. Green also sued other prison employees in *Green v. Calhoun* ("Green II"). The two cases were consolidated. Following discovery and by stipulation, certain defendants (including all *Green II* defendants) and other claims (including the conspiracy claim against Lieutenant Grubbs) were dismissed.

Two claims against Warden Hooks, Deputy Warden Brown, and Lieutenant Grubbs survived dismissal: (1) Defendants violated Green's Eighth and Fourteenth

15

Amendment rights to be free from cruel and unusual punishment, and (2) Defendants are liable under the theory of supervisory liability.[12]

The district court granted summary judgment in favor of Warden Hooks, Deputy Warden Brown, and Lieutenant Grubbs, holding that the Defendants did not violate any constitutional rights. The court also found that Defendants were entitled to qualified immunity. Green's supervisory-liability claims similarly failed because Defendants did not violate Green's constitutional rights.

## II.    STANDARD OF REVIEW

We review *de novo* a district court's grant of summary judgment, "viewing the facts and drawing all reasonable inferences in the light most favorable to . . . the nonmoving party." *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013) (citing *Liese v. Indian River Cty. Hosp. Dist.,* 701 F.3d 334, 341–42 (11th Cir. 2012)). In doing so, we determine "whether, viewing the record as it existed before the district court in the light most favorable to [Green], a genuine issue of material

---

[12] Green's complaint articulates the claims as follows: prison officials violated Green's constitutional rights by "condoning and promoting unsafe prison conditions known to place transgender Green in substantial risk of physical injury; by showing deliberate indifference to actual physical injuries Defendants knew Green had suffered and thereby creating an environment that led to her actually being anally raped; and by showing deliberate indifference to Green being placed in a 'protective-custody' cell with an inmate Defendants (at the very least Grubbs . . . ) knew was Green's sexual assailant."

fact existed as to whether [the prison officials'] actions constituted deliberate indifference" to Green.  *Steele v. Shah*, 87 F.3d 1266, 1269 (11th Cir. 1996).[13]

"Where the evidence is circumstantial, a court may grant summary judgment when it concludes that no reasonable jury may infer from the assumed facts the conclusion upon which the non-movant's claim rests." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).  We will affirm the district court's grant of summary judgment "if we conclude that there is no genuine issue of material fact—that is, if no 'fair-minded jury could return a verdict for the plaintiff on the evidence presented.'" *Goodman*, 718 F.3d at 1331 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

We now turn to the issues raised on appeal. We consider whether Warden Hooks, Deputy Warden Brown, or Lieutenant Grubbs violated Green's Eighth and

---

[13] We "pause to emphasize attorneys' obligations under Federal Rule of Appellate Procedure 28 generally and in the specific context of a qualified immunity appeal." *Johnson v. City of Fort Lauderdale, Fla.*, 126 F.3d 1372, 1373 (11th Cir. 1997). Appellants must submit a brief containing "a concise statement of the case setting out the facts relevant to the issues submitted for review . . . with appropriate references to the record." *See* Fed. R. App. P. 28(a)(6). These requirements are particularly pertinent in a qualified immunity appeal where the plaintiff is required to "carefully set out the facts which, if proven, would constitute violations of clearly established law on the part of each defendant." *Johnson*, 126 F.3d at 1373.

Unfortunately, as was the case in the district court, Green has "made exceedingly difficult this Court's task of determining what material facts are in genuine dispute."  On appeal, Green continues to "repeatedly mystif[y] the facts, confuse[] the timeline of the events, and make[] multiple unsupported assertions."

17

Fourteenth Amendment rights to be free from cruel and unusual punishment, and whether they are liable under the theory of supervisory liability.

For the reasons that follow, we affirm the district court's grant of summary judgment in favor of the prison officials.

## III.    EIGHTH AMENDMENT DELIBERATE INDIFFERENCE CLAIM

Green's constitutional claim centers around the Eighth Amendment's prohibition of "cruel and unusual punishment."[14] In particular, Green alleges that Warden Hooks, Deputy Warden Brown, and Lieutenant Grubbs knowingly ignored the substantial risk of danger to Green as a transgender inmate, thus subjecting Green to cruel and unusual punishment by allowing Green to be sexually assaulted by Ricard while in prison.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. *See Purcell ex rel. Estate of Morgan v. Toombs Cty.*, *Ga.*, 400 F.3d 1313, 1319 (11th Cir. 2005). It is well settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)).  Although

---

[14] The Eighth Amendment applies to convicted inmates, while a pretrial detainee's constitutional rights arise from the Due Process Clause of the Fourteenth Amendment. *See Purcell ex rel. Estate of Morgan v. Toombs Cty.*, 400 F.3d 1313, 1318 n.13 (11th Cir. 2005). Thus, only Green's Eighth Amendment right is at issue here. Regardless, "the standards under the Fourteenth Amendment are identical to those under the Eighth." *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).

18

prison officials have a duty to protect a prisoner from violence by other prisoners, not "every injury suffered by one prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. "Rather, a prison official violates the Eighth Amendment [in the context of a failure to prevent harm] only 'when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk.'" *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1320 (11th Cir. 2016) (quoting *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014)); *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc) ("[a] prison official's *deliberate indifference* to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment." (emphasis added)), abrogated on other grounds by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561-63 (2007)).

Thus, in order to survive summary judgment on her § 1983 deliberate-indifference claim, Green must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1582 (11th Cir. 1995) (citation omitted). "[D]eliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott v. Foley*, 182 F.3d 1248,

19

1255 (11th Cir. 1999).  Accordingly, Green must show that an objectively serious risk of harm existed *and* that the prison officials were subjectively aware of this risk of harm.  *Farmer*, 511 U.S. at 834.  Subjective awareness requires that the prison officials "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [they] must also draw the inference." *Id.* at 837.  Under the Eighth Amendment, "an official's failure to alleviate a significant risk that he *should have* perceived but did not . . . cannot under our cases be condemned as the infliction of punishment."  *Id.* at 838 (emphasis added).  In short, we will not find a prison official liable under the Eighth Amendment "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] *must also draw the inference*.'" *Goodman*, 718 F.3d at 1332 (quoting *Purcell*, 400 F.3d at 1319–20).

Even if Green's Eighth Amendment claim survives summary judgment, the prison officials argue that they are nevertheless entitled to qualified immunity. Qualified immunity protects government officials[15] like Warden Hooks, Deputy Warden Brown, and Lieutenant Grubbs "from liability for civil damages insofar as

---

[15]  For qualified immunity to apply, the government officials must be "acting within the scope of [their] discretionary authority when the allegedly wrongful acts occurred.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)). In this case, it is undisputed that the prison officials were acting within the scope of their discretionary authority, so the only question is whether "the official's alleged conduct violated a constitutional right, and [if] the constitutional right at issue was clearly established." *Id.*

their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Morris v. Town of Lexington*, 748 F.3d 1316, 1321 (11th Cir. 2014) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

Green's Eighth Amendment arguments can be summarized as follows. First, the prison officials were subjectively aware of the substantial risk to Green's safety as a transgender inmate placed in a general population dormitory. Second, Warden Hooks and Deputy Warden Brown were aware of and disregarded the threats to Green's safety that she identified in the letters Green sent to her mother, Warden Hooks, and Deputy Warden Brown. Third, Lieutenant Grubbs was aware of the threat Ricard posed to Green's safety and acted with deliberate indifference by placing Green in a cell with Ricard. Lastly, the prison officials were aware of the general threat to Green's safety posed by unsafe prison conditions at Rodgers. Green argues that, because the prison officials knew of and disregarded these various risks to her safety, the prison officials violated the Eighth Amendment. We address each of Green's arguments in turn.

### 1. Green's Placement in General Population

Green alleges that the prison officials were deliberately indifferent when they placed Green in a general population dormitory, despite knowing that Green was transgender and initially sending her to Administrative Segregation when she arrived

at Rodgers. In support, she argues that her initial assignment in Administrative Segregation demonstrated the prison officials' subjective knowledge of the risk posed by the general population dormitory to Green as a transgender inmate.

While it is undisputed that Green was initially sent to Administrative Segregation upon arrival at Rodgers, the only material evidence in the record demonstrates her placement there was due to a bed shortage, not because of a safety risk. The prison officials testified about the Rodgers intake process and the bed shortage at the time Green arrived at Rodgers, which resulted in her temporary placement in Administrative Segregation. Furthermore, Green admitted to a GDC investigator that she was placed in Administrative Segregation "for about four days" upon arrival at Rodgers because "[t]hey did not have bed space" in general population. Moreover, in Green's written admissions pursuant to Rule 36 of the Federal Rules of Civil Procedure, Green confirmed that her statements to the investigator were truthful and accurate. *See* Fed. R. Civ. P. 36(a).[16] Because Green's Rule 36 admission has not been withdrawn or amended, it conclusively establishes that Green was initially housed in Administrative Segregation simply because there was a shortage of beds in general population housing. *See* Rule 36(b) ("A matter

---

[16] Fed. R. Civ. P. 36(a)(1) states: "A party may serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b)(1) relating to:
    (A) facts, the application of law to fact, or opinions about either; and
    (B) the genuineness of any described documents."

admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."). Thus, Green may not now argue that a genuine dispute of fact exists with respect to why she was placed in Administrative Segregation. *See United States v. 2204 Barbara Lane*, 960 F.2d 126, 129-30 (11th Cir. 1992) ("Unless the party securing an admission [under Rule 36] can depend on its binding effect, he cannot safely avoid the expense of preparing to prove the very matters on which he has secured the admission, and the very purpose of the rule is defeated." (quotations omitted)).

Green nonetheless asks us to disregard her Rule 36 admission as well as the other evidence and infer that the missing memorandum regarding the basis for the decision initially placing Green in Administrative Segregation, confirms Green's version of the "central fact." Specifically, Green argues that this missing memorandum would have established: (1) that the prison officials knew Green was transgender and (2) acknowledged the substantial risk to her safety by placing her in involuntary protective custody immediately upon her arrival.  In short, Green wants an adverse inference based on the missing memorandum. Notwithstanding that Green's assertions as to the contents of the missing memorandum are based on pure speculation, "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997). Green has presented no evidence of

23

bad faith and, as such, no adverse inference may be drawn from the memorandum's absence.

To the extent that Green points to the mere fact of her placement in general population as evidence of deliberate indifference, the record does not support such an argument. It is undisputed that Green was screened and classified as a minimum-security prisoner, and she was not designated as a PREA victim or aggressor. The PREA screening took into account details like Green's sexual orientation, gender orientation, and Green's own perception of her vulnerability. Based on Green's intake screening, officials had no reason to suspect that Green was in any particular danger of being sexually assaulted.[17]  Moreover, the record indicates that Green had been housed in general population when she was previously incarcerated. Thus, Green has failed to prove that officials were subjectively aware of any risk to Green's safety simply by virtue of placing her in general population.

For these reasons, no reasonable jury could conclude that that the prison officials were deliberately indifferent when they placed Green in the general population dormitory.

---

[17] Green also points to the fact that she was sexually assaulted by Ricard as proof that the risk she faced was substantial. But "[t]his argument does not hold up to logical scrutiny; it rests entirely on hindsight bias. The mere fact that an event takes place does not indicate how likely it was to occur. A risk calculation is a prospective determination of what might happen based upon events that have already occurred." *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015).

### 2. The meeting between Green, Warden Hooks, and Deputy Warden Brown[18]

Green also argues that Warden Hooks and Deputy Warden Brown had subjective knowledge of the heightened risk to Green's safety because they were aware of specific threats faced by Green. Green points to the letter she sent to her mother—which prompted her mother's call to Warden Hooks—and to the subsequent meeting Green had with Warden Hooks and Deputy Warden Brown about that letter, in order to establish the prison officials' awareness of the risk.

It is undisputed that Green's mother, upon receiving the letter from Green stating that her life was in "great danger," immediately called Warden Hooks. Warden Hooks—the same day he received this call—sent for Green. Nevertheless, Green has failed to establish that the prison officials had any "subjective knowledge of" a risk to her safety. *Farmer*, 511 U.S. at 834, 837; *McElligott*, 182 F.3d at 1255. It is undisputed that, during the private meeting with Warden Hooks and Deputy Warden Brown, Green repeatedly denied being in any danger. Moreover, Green reiterated the denial when pressed by Warden Hooks and again explicitly denied being in danger while on the phone with her mother during the meeting. Green's strenuous denials about being in danger effectively erased any "subjective

---

[18] Given that Lieutenant Grubbs was not present for the meeting and played no part in returning Green to general population, no reasonable jury could find that Lieutenant Grubbs was subjectively aware of a substantial risk of serious harm to Green that may have arisen from the meeting.

25

knowledge" that the prison officials might otherwise have had from the initial letter and the phone call from Green's mother to Warden Hooks. Because Green reiterated that everything was "okay," no reasonable jury could conclude that the prison officials "actually knew of a *substantial risk* that [a fellow inmate] would *seriously harm*" her. *Caldwell v. Warden*, 748 F.3d 1090, 1102 (11th Cir. 2014) (emphasis in original).

But, Green argues, they should have known anyway. The prison officials should have disregarded Green's denials at the meeting because "being a transgender person and being inside a facility like Rogers [sic] and being around people that are with violent offenses, whether it was Darryl Ricard or any other individual," placed the officials on alert that Green was subject to a substantial risk of serious harm. In sum, Green asks us to infer that the prison officials must have known of this harm based on the letter Green sent to her mother and the fact that Green is a transgender inmate.

We disagree. An argument that "they should have known" is insufficient; Green must present evidence to "support a reasonable jury's finding that [the prison officials] harbored a subjective awareness that [Green] was in serious danger." *Goodman*, 718 F.3d at 1332; *see also Farmer*, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he *should have* perceived but did not . . . cannot under our cases be condemned as the infliction of punishment." (emphasis

26

added)). Having already determined that Green's denials to Warden Hooks and Deputy Warden Brown rebutted the danger alleged in the letter, Green's status as a transgender inmate does not change our analysis. As explained above, based on Green's intake screening, officials had no reason to suspect that Green was in any particular danger of being sexually assaulted.

Green also argues that her mere failure to identify her attacker by name should not shield the prison officials. In *Rodriguez v. Secretary for Department of Corrections*, we found that an inmate is not required to identify the individual who poses a threat so long as the inmate provides prison officials with other specific facts that put prison officials "on actual notice of a substantial risk of harm." 508 F.3d 611, 621 (11th Cir. 2007). For instance, while not identifying a particular individual who posed a threat, Rodriguez informed prison officials: "(1) that he was a former Latin King who decided to renounce his membership; (2) that members of the Latin Kings had threatened to kill him when he returned to the compound in retaliation for his renunciation; (3) that the compound at [the prison] was heavily populated with Latin Kings; and (4) that, in order to prevent an attempt on his life, he needed either to be transferred to another institution or to be placed in protective custody." *Id.* at 621. We concluded that based on this "specific information," "a reasonable juror could find . . . that [the prison official] actually knew Rodriguez faced a substantial risk of serious harm." *Id.* at 621-22. But that is not the case here. Green did not

27

just fail to identify her attacker, she denied that she faced any threat of being attacked at all.

Green further alleges that, because Warden Hooks gave Green a piece of paper upon leaving the meeting, the prison officials knew about the risk of harm to Green. But the record indicates that Green was given a piece of paper to prevent suspicion by other inmates that she was a "snitch." This action shows that Warden Hooks was subjectively aware of a different potential harm—the risk of physical harm to Green based on other inmates' belief that she was a snitch—not that Warden Hooks was aware of the risk of sexual violence that Ricard posed to Green.[19]  Thus, the note does not support a finding that either official was deliberately indifferent to any potential harm Green faced from Ricard.

### 3. Green's Letters to Warden Hooks and Deputy Warden Brown[20]

Green also points to the letters she sent to Warden Hooks and Deputy Warden Brown in September as evidence that the prison officials had subjective knowledge of the substantial risk of harm she faced.  However, both Warden Hooks and Deputy Warden Brown insist that they never received or read a letter from Green. Deputy Warden Brown, who was allegedly sent the only letter that expressly identified

---

[19] Moreover, this action demonstrates that when Warden Hooks and Deputy Warden Brown had knowledge or apprehension of potential danger, they took action to protect Green.

[20] It is undisputed that Green never sent a letter to Lieutenant Grubbs.

Ricard as Green's assailant, further stated that he would not have received such a letter without acting on it.

Green argues that the letters are entitled to a presumption of receipt under the classic "mailbox rule" doctrine. In so arguing, Green refers to the common-law doctrine that "has long recognized a rebuttable presumption that an item properly mailed was received by the addressee." *Konst v. Fla. E. Coast Ry. Co.*, 71 F.3d 850, 851 (11th Cir. 1996); *see also Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1239 (11th Cir. 2002). Under this Circuit's precedent, "[t]he 'presumption of receipt' arises upon proof that the item was properly addressed, had sufficient postage, and was deposited in the mail." *Konst*, 71 F.3d at 851. Green asks us to extend this doctrine to the internal prison mail system at Rodgers and assume Warden Hooks and Deputy Warden Brown received the letters.

We have not previously ruled on the applicability of the mailbox rule in the context of a prison mail system for internal mail within the prison. The record is entirely devoid, however, of any evidence about how internal mail is collected, sorted, and delivered at Rodgers; the timeliness and consistency with which mail is delivered; or the overall reliability of the system. Without any factual development as to how the Rodgers internal mail system operates, we cannot ascertain the reasonableness of the "mailbox rule" presumption to the Rodgers mail system.

29

Accordingly, on this record, we decline to extend the "mailbox rule" presumption requested by Green. We will not assume that because Green placed the letters in the internal prison mail system, the letters were delivered to and received by the prison officials prior to the assault. Consequently, those letters cannot serve as a basis for finding that Warden Hooks and Deputy Warden Brown were subjectively aware of any risk to Green.

### 4. Placement of Green in Cell 22 with Ricard

Green argues that Lieutenant Grubbs was deliberately indifferent to the threat Ricard posed to Green's safety by placing Ricard and Green in Cell 22 together.  In support of this argument, Green alleges that Ricard told Green he had "arranged" for Lieutenant Grubbs to place them in the same cell.  This allegation was corroborated by another inmate, Joel Reid, who testified that Ricard told him that he was going to speak to Lieutenant Grubbs and ensure that Ricard and Green were placed in the same cell in administrative segregation.

Both Ricard and Lieutenant Grubbs, however, tell a distinctly different story. Although Ricard admitted that he may have asked to be placed in the cell with Green, he denied telling Green that he orchestrated the arrangement with Lieutenant Grubbs.  Likewise, Lieutenant Grubbs denies that Ricard asked her to be placed in a cell with Green.  Moreover, Lieutenant Grubbs denied making the cell assignments. Rather, she stated that she only escorted Green, Ricard, and the other inmates that

had been "put on the door" from the A1 dormitory to the Administrative Segregation housing unit, and then asked another officer to make the cell assignments.

Nevertheless, even assuming, *arguendo*, that Lieutenant Grubbs made the cell assignments and/or agreed to place Ricard in the same cell with Green, such action does not establish that Lieutenant Grubbs acted with deliberate indifference to Green's safety because there is no evidence that Lieutenant Grubbs was aware of any threat posed by Ricard to Green. It is undisputed that Lieutenant Grubbs was not present at the meeting between Warden Hooks, Deputy Warden Brown, and Green during which Green's letter to her mother was discussed. Green does not allege that she spoke to Lieutenant Grubbs about feeling threatened or being sexually assaulted. And, Lieutenant Grubbs confirmed that during her limited encounter with Green while escorting her to the Administrative Segregation unit, Green did not tell Lieutenant Grubbs that she was being sexually assaulted by anyone, nor did Green relay any other specific threat.  Accordingly, Green failed to produce enough evidence to survive summary judgment on this issue.

### 5.  Allegations that Rodgers State Prison was exceedingly dangerous

Green argues that, as a general matter, Rodgers was exceedingly dangerous and had high rates of sexual assault and violence.  It is well established that an inmate has an Eighth Amendment right "to be reasonably protected from constant threat of violence and sexual assault by his [or her] fellow inmates." *Purcell*, 400 F.3d at

31

1320–21 (quoting *Woodhous v. Virginia*, 487 F.2d 889, 890 (4th Cir. 1973)). While "confinement in a prison where violence and terror reign is actionable," *id*. at 220, "[w]e stress that [a] plaintiff . . . must show more than 'a generalized awareness of risk.'" *Caldwell*, 748 F.3d at 1101. In order to show that a substantial risk of serious harm existed based on the general threat posed by inmate-on-inmate violence at Rodgers, Green must prove "that serious inmate-on-inmate violence was the norm or something close to it." *Purcell*, 400 F.3d at 1322 (citation omitted).

In *Harrison v. Culliver*, 746 F.3d 1288 (11th Cir. 2014), we considered whether 33 incidents of inmate-on-inmate violence—four of which occurred in the same hallway where the assault of the plaintiff occurred—over the period of three and a half years in a prison housing 800-900 inmates created a substantial risk of serious harm, for purposes of § 1983 Eighth Amendment liability. We concluded that the evidence presented in that case was "hardly sufficient to demonstrate that [the institution] was a prison 'where violence and terror reign.'" *Id.* at 1300 (quoting *Purcell*, 400 F.3d at 1320).

Here, the record in this case does not support Green's claim. There is evidence that 28 reported incidents of sexual assault occurred over five years at Rodgers, which had a prison population of 1,500 inmates. While sexual assault is terrible, under our precedent, these numbers do not rise to the level of demonstrating that Rodgers was "a prison 'where violence and terror reigned.'" *Id.* Indeed, Green has

32

pointed to fewer instances of sexual violence reported over a longer period of time at Rodgers, in an even larger facility than the prison in *Harrison*. Nor has Green pointed to any evidence that specific features of Rodgers[21] or its population[22] render it particularly dangerous. Because Green has failed to offer evidence of pervasive staffing issues, logistical issues, or other risks posed by the prison population in Rodgers, we cannot say that Green has proven that the conditions at Rodgers posed a substantial risk of serious harm.

* * *

Ultimately, we conclude that no genuine issues of material fact remain with respect to Green's deliberate indifference Eighth Amendment claim because the record taken as a whole could not lead a rational trier of fact to find in favor of Green.

---

[21] For example, pervasive staffing issues or logistics issues that prevent prison officials from addressing violence may support a claim of deliberate indifference to a substantial risk of serious harm. *See, e.g.*, *Lane v. Philbin*, 835 F.3d 1302, 1307–08 (11th Cir. 2016) (allegations that only one officer supervised two separate dorms and that inmates regularly brought back weapons from their work detail, fashioned weapons from prison materials—and officials did not confiscate weapons sufficiently set out a substantial risk of serious harm); *Hale*, 50 F.3d at 1582–83 (evidence that defendant was aware of severe overcrowding problems and the fact that "inmate-on-inmate violence occurred regularly when the jail was overcrowded" was sufficient to withstand summary judgment).

[22] *See Cottone v. Jenne*, 326 F.3d 1352, 1355–56, 1358–59 (11th Cir. 2003) (prison population of mentally ill inmates who were kept in unlocked cells and they could interact with each other was sufficient to prove potential knowledge of a substantial risk of serious harm when the guards were aware of an inmate's history of violent schizophrenic outbursts).

33

*Goodman*, 718 F.3d at 1331 (quotation marks omitted); *see also* Fed. R. Civ. P. 56(a). We affirm the district court's order finding no constitutional violation.[23]

## IV.    SUPERVISORY LIABILITY CLAIMS

"It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (quoting *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)). Simply put, "there can be no supervisory liability . . . if there was no underlying constitutional violation." *Paez v. Mulvey*, 915 F.3d 1276, 1291 (11th Cir. 2019) (quoting *Gish v. Thomas*, 516 F.3d 952, 955 (11th Cir. 2008). Because Green failed to allege a constitutional violation, her supervisory-liability claims cannot stand.

## V.    CONCLUSION

In light of the foregoing, the district court did not err in granting summary judgment in favor of the prison officials.

**AFFIRMED.**

---

[23] Because we find that no constitutional violation occurred, we need not address the prison officials' argument that they are entitled to qualified immunity.